UNITED STATES, Appellant,

v.

Ricky L. JACKSON, Appellee.

Ricky L. JACKSON, Appellant,

v.

UNITED STATES, Appellee.

Nos. 85–59, 85–125.

District of Columbia Court of Appeals.

Argued Nov. 14, 1985.
Decided July 9, 1987.

William T. Morrison, Washington, D.C., appointed by the court, for appellee in No. 85–59 and appellant in No. 85–125.

Judith Hetherton, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, and Keith A. O'Donnell, Asst. U.S. Attys., Washington, D.C., were on brief, for appellant in No. 85–59 and appellee in No. 85–125.

Before NEBEKER, MACK and ROGERS, Associate Judges.

ROGERS, Associate Judge.

We are asked to decide whether to retain the "year and a day rule" as law in the District of Columbia. A Superior Court trial judge, relying upon this ancient doctrine,[1] dismissed a second-degree murder indictment brought against appellee Jackson in No. 85–59. The government appeals the dismissal. It argues that the rationale for the year and a day rule no longer exists, that courts faced with the question in the last twenty-five years have uniformly criticized the rule and with two exceptions have abrogated it, that the rule has never expressly been adopted in this jurisdiction and its recognition would serve no legitimate public policy, and that judicial abrogation of a common law rule is appropriate. Further, the government argues, were we to abrogate the rule, no constitutional or other bar would prevent prosecuting appellee for second-degree murder. Appellee responds, principally, that this court should defer to the legislature because the rule may serve important social values which the court is ill equipped to evaluate, and, in any event, its abrogation to permit his prosecution for second-degree murder would constitute double jeopardy and violate the ex post facto clause of the fifth amendment of the Constitution. Appellee also cross-appeals in No. 85–125 on the ground that this court lacks jurisdiction to hear this case because the government failed to show excusable neglect in filing an untimely appeal under our Rule 4–II,[2] and, in any event, that the appeal is barred by the double jeopardy clause of the Constitution.

We hold we have jurisdiction to review this case because, under unusual circumstances, the government's appeal was perfected within the period allowed by our rules, and that double jeopardy does not bar the appeal. We also conclude that abrogation of the common law year and a day rule is overdue and properly accomplished by judicial opinion, and leave it to the legislature to determine if a time limitation on death should exist in the District of Columbia other than the limitations arising from the requirements of due process of law and of proof beyond a reasonable doubt of causation. We hold, however, that, although collateral estoppel principles incorporated in the double jeopardy clause do not, the ex post facto clause does bar the prosecution of appellee for second-degree murder; accordingly, the order dismissing the indictment is affirmed.

I

Walter Bloss was wounded by a gunshot to the back of the head on January 2, 1982, and taken at once to Howard University Hospital. He was never discharged from the hospital, but remained there until his death fourteen months after the assault. In the meantime, appellee Ricky Jackson was brought to trial on charges stemming from the January 2nd incident, and found guilty by a jury of assault with a dangerous weapon, D.C.Code § 22–502 (1981), and carrying a pistol without a license, D.C. Code § 22–3204 (1981), and not guilty of assault with intent to kill while armed, D.C.Code §§ 22–501, –3202 (1981). Later, after Bloss' death, the government obtained an indictment charging Jackson with second-degree murder while armed, D.C. Code §§ 22–2403, –3202 (1981).[3] Relying

---

1. Under the common law, an assailant may be prosecuted for homicide only if the victim dies within a year and a day of the injury inflicted.

2. A cross-appeal on this issue was unnecessary. Error in an excusable neglect finding can be raised by a motion to dismiss filed in this court.

3. There is no question that the injury inflicted by Jackson killed Bloss. According to the au-

on the year and a day rule, the trial judge dismissed the indictment. It is from this order that the government appeals.

The dismissal was posted in the court jacket on December 24, 1984, outside the presence of the parties and without previous notice to them. The jacket entry merely notes "Motion to Dismiss Granted. Order filed within. Ct. 'G' of Indictment is dismissed." Despite the requirements of former D.C.App.R. 4–II(b)(4)[4] and Super. Ct.Crim.R. 49(c),[5] no entry was ever made in the docket by the Clerk of the Superior Court indicating that the dismissal order had been mailed.

When the docket entry was made, the prosecutor assigned to the case had left town for the Christmas holiday. Before departing, he asked the trial judge's law clerk to send any orders issued during his vacation to another government attorney. After the order was issued late in the day on Christmas Eve, the trial court forwarded two notices to the government, but both were in the same envelope and addressed and delivered to the office of the original prosecutor. When he returned to work on January 7, 1985, the prosecutor opened the envelope, immediately filed with the trial court a motion for leave to file notice of appeal out of time, and served a copy of the motion on defense counsel. On January 17, 1985, the trial court granted the motion, finding excusable neglect pursuant to former D.C.App.R. 4–II(b)(3), and ex-

tended the time for filing the notice until January 31, 1985.[6] It is from this order that Jackson cross-appeals. *See supra* *note 2.*

II

Former D.C.App.R. 4–II controls the computation of time with respect to Jackson's jurisdictional contentions.[7] When considering criminal appeals noted by defendants, this court previously has held that, in the absence of a docket entry or other proof of mailing by the Clerk of Superior Court, the time for appeal begins to run from the time of the defendant's actual notice of the order. *McClurkin v. United States,* 472 A.2d 1348, 1351, *cert. denied,* 469 U.S. 838, 105 S.Ct. 136, 83 L.Ed.2d 76 (1984); *Little v. United States,* 438 A.2d 1264, 1267 (D.C.1981); *Samuels v. United States,* 435 A.2d 392, 395 (D.C. 1981); *Williams v. United States,* 412 A.2d 17, 20 (D.C.1980). Here, there was no proper docket entry referring to the order dismissing the indictment, and the government, not the defendant, wished to appeal.

■ The government did not receive actual notice of the dismissal of the indictment until the prosecutor originally assigned to the instant case returned from vacation on January 7, 1985, and found the envelope containing the dismissal order on his desk. On that same date the govern-

---

topsy report, the cause of his death was "acute broncopneumonia due to quadriplegia with prolonged coma due to gunshot wound of the head."

4. D.C.App.R. 4 (b)(1), effective January 1, 1985, allows thirty days for the filing of a notice of appeal. The government, however, does not contend that the current rule governs this appeal. The rule in effect at the time the order was filed provided that appeals should be noted "within 10 days after the entry of the judgment." D.C.App.R. 4–II(b)(1) (1983). However, the rules also provide that:

Upon a showing of excusable neglect the Superior Court may, before or after the time prescribed by subdivision (1) has expired, with or without motion and notice, extend the time for filing a notice of appeal for a period not to exceed 30 days from the expiration of the time otherwise prescribed by subdivision (1).

D.C.App.R. 4–II(b)(3) (1983).

5. Super.Ct.Crim.R. 49(c) provides:

In all cases where a party or his attorney is not present, immediately upon the entry of an order made on a written motion subsequent to arraignment the Clerk shall mail to each party a notice thereof and shall make a note in the docket of the mailing. Lack of notice of the entry by the Clerk does not affect the time to appeal or relieve or authorize the Court to relieve a party for failure to appeal within the time allowed, except as permitted by the Rules of the District of Columbia Court of Appeals.

6. A formal notice of appeal was filed on January 18, 1985.

7. *See supra* note 4.

ment filed its motion for leave to appeal out of time. The trial court granted the motion, and allowed the government until January 31 to file a notice of appeal. The government's filing on January 18th of its notice of appeal was timely. Since the trial court was authorized by our vote, *see supra* note 4, to extend the government's time, we hold the government's notice was timely. Hence, we need not reach the issue whether the filing of the government's motion itself satisfied the requirement that an appeal be noted in a timely manner.[8] *See, e.g., McClurkin, supra,* 472 A.2d at 1351–52; *Interstate Natural Gas Association of America v. FERC, supra* note 8, 244 U.S. App.D.C. at 149, 756 F.2d at 170; *Fischer v. United States Department of Justice,* 759 F.2d 461, 463–64 (5th Cir.1985); *United States v. Lucas,* 597 F.2d 243, 245 (10th Cir.1979).

## III

The year and a day rule has roots deep in the soil of our common law. Its origins have been traced to the thirteenth century. *See, e.g., State v. Pine,* 524 A.2d 1104, 1105 (R.I.1987); *People v. Stevenson,* 416 Mich. 383, 331 N.W.2d 143, 145 (1982); *Commonwealth v. Lewis,* 381 Mass. 411, 409 N.E.2d 771, 773 (1980), *cert. denied,* 450 U.S. 929, 101 S.Ct. 1386, 67 L.Ed.2d 360 (1981) (discussing the antique Statute of Glouster, 6 Edw. 1, c. 9 (1278), which provided that a private prosecution for homicide shall not

abate if brought within a year and a day of the death); *Elliott v. Mills,* 335 P.2d 1104, 1106–08 (Okla.Crim.Ct.App.1959); *Commonwealth v. Ladd,* 402 Pa. 164, 166 A.2d 501, 503 (1960).[9] By the 18th century, the assumption was that a homicide prosecution could be brought only if the victim had died within a year and a day of the injury. This doctrine, quite separate from earlier statues of limitation, was discussed by Lord Coke, and also by the eighteenth century commentators Hawkins and Blackstone. *Commonwealth v. Ladd, supra,* 166 A.2d at 503 (citing 1 Hale, Historia Placitorium Coronae (1736); 3 COKE, INSTITUTIONS OF LAW OF ENGLAND, Ch. VII; 1 HAWKINS, PLEAS OF THE CROWN 91 (Curwood ed. 1824); 4 BLACKSTONE, COMMENTARIES 197 (1769) and others));[10] *see also State v. Pine, supra,* 524 A.2d at 1105–07; *State v. Brown,* 21 Md.App. 91, 318 A.2d 257, 258–59 & nn. 2–4 (Ct.Spec.App.1974) (citations omitted). The application of the rule to criminal prosecutions has been acknowledged by the Supreme Court:

In cases of murder the rule at common law undoubtedly was that no person should be adjudged "by any act whatever to kill another who does not die by it within a year and a day thereafter...." And such is the rule in this country in prosecutions for murder, except in jurisdictions where it may be otherwise prescribed by statute.

**8.** We note, however, that the record clearly reflects the government's intent to appeal within the statutory period. Such a statement of intent achieves the objectives of the notice requirements in our rules: to alert the opposing party to the taking of the appeal. Furthermore, allowing such an unambiguous statement of intention to satisfy the notice requirement would not enlarge the jurisdictional period, but merely preserve rights which existed at the time the motion was filed. *See Fallen v. United States,* 378 U.S. 139, 142, 84 S.Ct. 1689, 1691, 12 L.Ed.2d 760 (1964); *(James) Jackson v. United States,* 119 A.2d 721, 722 (D.C.1956); *accord, Interstate Natural Gas Association of America v. FERC,* 244 U.S.App.D.C. 145, 149, 756 F.2d 166, 170 (1985).

**9.** The thorough research done by the government indicates that there is general agreement that the rule probably originated as a limitation

applicable to the antiquated civil action known as "appeal of death," "which was a private and vindictive process by an interested party and which grew out of the old Germanic custom of 'weregild,' or compensation for the death." *Commonwealth v. Ladd, supra,* 166 A.2d at 503. Such appeals became obsolete long before they were abolished in 1819. *Commonwealth v. Lewis, supra,* 409 A.2d at 772.

**10.** In *Commonwealth v. Ladd, supra,* 166 A.2d at 502, it is pointed out that there was confusion about the nature of the rule, citing, *e.g.,* HEYDON'S CASE, 4 COKE'S REPORT 41 (rule runs from the date of death and not the date of the injury); 3 COKE's "INSTITUTES OF LAWS OF ENGLAND", ch. VII at 47 & 52 (rule runs from date of death). Blackstone, however, in defining murder, distinguished the rule from a statute of limitations. *Id.* at 503 (citing Book IV, ch. 14 of the Commentaries (1769), at p. 197).

*Louisville, Evansville, & St. Louis Railroad Co. v. Clarke*, 152 U.S. 230, 239, 14 S.Ct. 579, 581, 38 L.Ed. 422 (1894) (citations omitted) (civil wrongful death action).

### A.

■ The common law of the District of Columbia encompasses all common law in force in Maryland in 1801, unless expressly repealed or modified. *O'Connor v. United States*, 399 A.2d 21, 25 (D.C.1979); *see also* D.C.Code § 49–301 (1981). In 1776, Maryland adopted the common law of England as it then existed. *O'Connor, supra; Gertman v. Burdick*, 75 U.S.App.D.C. 48, 53, 123 F.2d 924, 929 (1941) ("Section 3 of Maryland's Original Declaration of Rights (1776) provides: 'That the inhabitants of Maryland are entitled to the common law of England....' "), *cert. denied*, 315 U.S. 824, 62 S.Ct. 917, 86 L.Ed. 1220 (1942). Therefore, we look to early Maryland law to resolve the question whether the year and a day rule is law in the District of Columbia.

The Court of Appeals of Maryland has held that the year and a day rule is part of the common law of Maryland because it was part of the English common law in 1776. *State v. Brown, supra*, 318 A.2d at 258; *see State v. Minster*, 302 Md. 240, 486 A.2d 1197, 1198 (1985).[11] A division of this court (in an opinion subsequently vacated for reasons not pertinent here) has unanimously concluded that the rule retains its viability in the District of Columbia. *In re*

*J.N., Jr.*, 406 A.2d 1275, 1283 (D.C.1979) (vacated; judgment of the trial court affirmed en banc by an equally divided court, *In re J.N., Jr.*, Nos. 10737 and 12150 (D.C. May 29, 1981) (unpublished)); *see also id.* at 1289 (Newman, J., dissenting).

■ We follow this reasoning in concluding that the common law year and a day rule is today the law in the District of Columbia. *See also Hopkins v. United States*, 4 App.D.C. 430, 438 (1894). Our decision is not altered by recognition of the fact that when Congress codified the law of the District of Columbia in 1901, it defined the elements of first and second-degree murder. *See* An Act to Establish a Code of Law for the District of Columbia, ch. 854, §§ 798–800, 31 Stat. 1189, 1321 (1901) (codified as amended at D.C.Code §§ 22–2401, –2403 (1981)).[12] That codification did not "abrogat[e] or alter[ ] any feature of murder at common law in the absence of an express intention on the part of Congress to do so." *O'Connor, supra*, 399 A.2d at 26; *compare id. with State v. Hudson*, 56 Or.App. 462, 642 P.2d 331 (1982) (year and a day rule did not survive codification of criminal code based on Model Penal Code and New York statute) *and People v. Brengard*, 265 N.Y. 100, 105–08, 191 N.E. 850, 852–53 (1934) (omission of year and a day rule from codification of penal law effectively abolished rule). *See also Mead v. Phillips*, 77 U.S.App.D.C. 365, 371, 135 F.2d 819, 825 (1943) (District of Columbia

---

**11.** This conclusion is in accord with that reached by the courts of other jurisdictions which have considered this question. *See, e.g., State v. Pine, supra*, 524 A.2d at 1106–07; *People v. Stevenson, supra*, 331 N.W.2d 143; *State v. Zerban*, 617 S.W.2d 458 (Mo.Ct.App.1981); *State v. Young*, 77 N.J. 245, 390 A.2d 556 (1978); *State v. Sandridge*, 5 Ohio Op.3d. 419, 365 N.E.2d 898 (Com. Pleas 1977); *Elliott v. Mills, supra*, 335 P.2d 1104; *Commonwealth v. Ladd, supra*, 166 A.2d 501. An intermediate appellate court has determined that the year and a day rule does not exist in the statutory or common law of Illinois. *People v. Mudd*, 154 Ill.App.3d 808, 107 Ill.Dec. 716, 507 N.E.2d 869 (1987).

**12.** Those sections provide:

Whoever, being of sound memory and discretion, kills another purposely, either of deliberate and premeditated malice or by means of poison, or in perpetrating or attempting to

perpetrate any offense punishable by imprisonment in the penitentiary, or without purpose so to do kills another in perpetrating or in attempting to perpetrate any arson, as defined in § 22–401 or 22–402, rape, mayhem, robbery, or kidnapping, or in perpetrating or attempting to perpetrate any housebreaking while armed with or using a dangerous weapon, is guilty of murder in the first degree.

Whoever maliciously places an obstruction upon a railroad or street railroad, or displaces or injures anything appertaining thereto, or does any other act with intent to endanger the passage of any locomotive or car, and thereby occasions the death of another, is guilty of murder in the first degree.

Whoever with malice aforethought, except as provided in §§ 22–2401, 22–2403, kills another, is guilty of murder in the second degree.

Code amplified and defined by common law to extent subject not covered therein).

### B.

■ We turn to the question whether the year and a day rule should remain the law in the District of Columbia. Although the District of Columbia Code provides that the common law "shall remain in force in so far as [it is] inconsistent with, or ... replaced by, some provision of the ... Code," D.C.Code § 49–301, that provision is not a bar to the exercise of our inherent power to alter or amend the common law. *United States v. Tucker*, 407 A.2d 1067, 1609 (D.C. 1979); *see also Linkins v. Protestant Episcopal Cathedral Foundation*, 87 U.S.App. D.C. 351, 354–55, 187 F.2d 357, 360 (1950). Nor is *In re J.N., Jr., supra*, an obstacle under *M.A.P. v. Ryan*, 285 A.2d 310 (D.C. 1971), to our abrogation of the rule, the decision in *J.N., Jr.* having been vacated.

### 1.

Since the origin and purposes of the rule are obscure, we cannot say with certainty why the rule came into existence. *Commonwealth v. Lewis, supra,* 409 N.E.2d at 773; *State v. Young, supra* note 11, 390 A.2d at 562 (Schreiber, Jr., concurring) (citation omitted); *State v. Brown, supra,* 318 A.2d at 260. Most commentators suggest that it reflects the judgment that proof of causation for murder "should not be unduly speculative." *State v. Young, supra* note 11, 390 A.2d at 562 (Schreiber, J., concurring). Difficulties of proof arose because in early English courts, jurors decided cases by applying their own knowledge of the matter at hand or by reflecting the conviction of the community about the issue being decided. More importantly, medical technology was not capable of precisely determining the cause of death. *Commonwealth v. Lewis, supra,* 409 N.E.2d at 773. It also has been suggested that "the rule was intended simply to soften the old brutal law regarding homicides." *Id.* (citing *Commonwealth v. Evaul,* 5 Pa.D & C 105, 106 (1924)).

Obviously, a twentieth-century factfinder, when called upon to assess the relationship between an assault and a subsequent death, is not presented with the same causation problems as was his medieval counterpart. *See Greater Southeast Community Hospital v. Williams,* 482 A.2d 394, 398 (D.C.1984); *State v. Pine, supra,* 524 A.2d at 1107; *Commonwealth v. Lewis, supra,* 409 N.E.2d at 773, and cases cited therein. The government contends that scientific, technical, and medical progress has eliminated any reason for the continued vitality of "the anachronistic rule" in modern criminal law. Difficult questions of causation will remain, however, notwithstanding modern technology, particularly as the interval between the injury and the death lengthens. Still, this circumstance alone would hardly justify retention of the year and a day rule; difficult causation questions can arise regardless of the interval between an injury and death. *See, e.g., Stack v. United States,* 519 A.2d 147, 159–60 (D.C.1986) (defense of intervening cause between injury and death two and one half days later). Moreover, although no uncertainty about causation exists in the instant case, *see supra* note 3, even if it did, no more would follow than that the government would encounter difficulty in meeting its burden of proof of causation beyond a reasonable doubt, and this court could be faced with a difficult legal question upon appeal of the conviction. The government's heavy burden protects the defendant and difficult questions are hardly an unusual circumstance for this court, *see, e.g., Greater Southeast Community Hospital v. Williams, supra,* 482 A.2d at 398 (when life begins), or for any other court, *e.g., In re Quinlan,* 70 N.J. 10, 355 A.2d 647 (terminating life support of individual in permanent vegetative state), *cert. denied,* 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976).

### 2.

Accordingly, we must decide whether public policy considerations require retention of the rule or mandate its abrogation.

The government argues that public policy considerations require abrogation of a rule based on scientific inadequacies and an outmoded use of jurors; because those rea-

sons no longer exist as a result of the advances of science, the government reasons, the rule has abrogated itself. Further, the government notes the irony of a rule that insulates from full criminal responsibility persons who have committed a crime which the Council of the District of Columbia has declared so heinous that it should have no statute of limitations. *See* Report of the Council of the District of Columbia Judiciary Committee on Bill No. 4–121, the District of Columbia Criminal Statute of Limitations Act of 1982, at 4–5 (January 13, 1982); D.C.Code § 23–113(a)(1) (1986 Supp.). Finally, Jackson's fortuitous benefit from the advances of medicine which prolonged the victim's life, the government contends, presents no barrier of unfairness to his prosecution for murder, especially where, as here, the death occurred shortly after expiration of a year and a day and the rule poses a high social cost for society, where, as here, there is no question of causation.

Jackson's response is three-fold. He argues that notwithstanding scientific advances, the government's interest in prosecution of murder will be enhanced little, if at all, by abolition of the rule because the government now may seek life imprisonment for an armed assault, D.C.Code § 22–3202.[13] Second, the importance of finality in criminal prosecutions is a legitimate societal interest, which makes the rule necessary because of "lingering difficulties of proof and to remove the 'Sword of Damocles' hanging over a potential defendant." Third, because views differ greatly about what is the appropriate length of time after which a prosecution should be barred, the legislature is in a better position than a court to change the rule.

Reliance on the absence of evidence of frustrated prosecutions as a result of the

year and a day rule strikes us as unpersuasive: modern medical discoveries have made life-prolonging situations a more frequent occurrence in recent years and thus the effect of the rule may not often have been presented to the prosecutor.[14] Similarly, that the prosecutor is able to place other charges against an assailant makes the year and a day rule no less appealing in view of the legislative determination, and indeed the determination of the electorate itself by initiative,[15] of the measure of punishment upon conviction of different kinds of assaults. Surely the windfall for the assailant is a high price for society to pay for a rule which, as persuasively reasoned by the Supreme Judicial Court of Massachusetts, appears to have become not only an anachronism but is "capricious" and "senselessly indulgent" in establishing a particularly short limit. *Commonwealth v. Lewis, supra,* 409 N.E.2d at 773.

This is not to say, however, that we are unaware there may be important social values served by a time limitation on death and that the Council of the District of Columbia, and even the Congress in the exercise of its powers under Article 1, Section 8, clause 17 of the Constitution, is well situated to examine the policy issues inherent in such a determination. But to a large extent we are faced with a public policy vacuum. The public policy issues relating to the rationale for the year and a day rule have not been expressly examined by either of the legislatures of the District of Columbia, the Congress and the Council of the District of Columbia. Nor do we find any record of such an examination by the District of Columbia Bar or the general public in the District of Columbia. The rationale of the rule has not been addressed by this court or, prior to 1971, by its predecessor, the United States Court of Appeals for the

---

**13.** We note that our research has revealed no case in the District of Columbia other than the case at bar in which prosecution for murder was barred by the rule. *See, e.g.,* Annot., 60 A.L.R.3d 1323 (1974).

**14.** We note in passing that the ethical dilemma faced by families and physicians whenever a decision to prolong life bears on the prosecution

of an assailant would be eased by abrogation of the year and a day rule.

**15.** The District of Columbia Mandatory-Minimum Sentences Initiative of 1981 was adopted by the electors on September 14, 1982, took effect on June 7, 1983, 30 D.C.Reg. 1226–27 (1983), and is codified at D.C.Code § 33–541(c)(1) (1986 Supp.).

District of Columbia Circuit. *M.A.P. v. Ryan,* 285 A.2d 310 (D.C.1971). Although we have referred to the year and a day rule in prior decisions, *e.g., In re J.N., Jr., supra,* 406 A.2d at 1289; *see also Hopkins, supra,* 4 App.D.C. at 439 (quoting 1 Hale, Pleas of the Crown 428), in neither case was the rule necessary to the decision, and references, appropriately, have not discussed its rationale. Nothing since our most recent mention of the year and a day rule in 1979, in *In re J.N., Jr.,* reveals legislative intent, much less interest in the rule.[16] Indeed, the comprehensive study of the District of Columbia criminal code by the District of Columbia Law Revision Commission which was completed in 1978 included a recodification of the criminal code on homicide, yet nowhere in the Commission's report is the year and a day rule mentioned.[17]

This court has not had occasion to indicate that it would reexamine the justification of the rule when the issue is presented. *See, e.g., Commonwealth v. Golston,* 373 Mass. 249, 366 N.E.2d 744, 749 (1977) ("We take this occasion to announce that if the point comes before us we shall feel free to reexamine the justification for the rule."), *cert. denied,* 434 U.S. 1039, 98 S.Ct. 777, 54 L.Ed.2d 788 (1978)). Thus, not surprisingly, the record before us provides little, if any, assistance in defining what other time limit, if any, should exist in defining when a murder occurs.[18] On the other hand, to acknowledge that a temporal limitation in defining death may be desirable is not also to say that it necessarily should be a year and a day. Nor is it to suggest that abrogation of the rule would remove all limitations on assessing culpability; limitations necessarily would exist by virtue of the requirements of due process and the government's burden to prove causation beyond a reasonable doubt. Still, we acknowledge that these limitations may be insufficient to satisfy the public desire for certainty, and that courts generally lack the capability to determine what the limitation, if any, should be. These circumstances, while troubling, do not dispose of our task in the instant case, however.

The courts in this jurisdiction have long viewed the common law as "imbued with

---

**16.** When, in 1982, the Council of the District of Columbia enacted a statute of limitations that set no limitation on the time within which a prosecution for murder can be brought, D.C. Code § 23–113(a)(1) (1986 Supp.), no mention was made of the year and a day rule. Of course, statutes of limitations and the year and a day rule are not the same thing. *See State v. Brown, supra,* 318 A.2d at 259.

**17.** The D.C. Council's enactment of § 23–113(a)(1) was identical to the recommendation of the District of Columbia Law Revision Commission. *See* STAFF OF HOUSE COMM. ON THE DISTRICT OF COLUMBIA, 95th CONG., 2d SESS., NEW BASIC CRIMINAL CODE FOR THE DISTRICT OF COLUMBIA, LAW REVISION COMMISSION RECOMMENDATION, § 2 at 12, 85–86 (Comm. Print 1978). The Commission's recommendation was part of a comprehensive revision of major provisions of the criminal code which was prepared after extensive hearings throughout the District of Columbia community. . The Commission's proposal for a recodification of the criminal code on homicide (*see id.,* § 2, at 17, 99–108), did not refer to the year and a day rule. Although reliance on these circumstances is admittedly tenuous, since the Council did not enact the Commission's homicide recommendations, other than the statute of limitations, this is *all* the evidence of legislative interest we have found to date, and it is hardly a compelling reason for perpetuating a rule which a comprehensive analysis of the criminal code did not consider important enough to mention even in passing.

**18.** Those who argue against the rule have advanced at least three alternatives as superior to the year and a day limitation. The first is to retain the proposition of an irrebuttable presumption based on a time limit, but to extend the time to a longer period. At the present time, there is no consensus as to what may be an appropriate length of time, following an assault, after which prosecution for homicide should be barred. The legislatures of California and Washington have adopted a three years and a day rule. Cal.Penal Code § 194 (West 1970); Wash.Rev.Code § 9A.32.101 (1983). Texas recognizes a one year rule. *Aven v. State,* 102 Tex.Cr.R. 478, 277 S.W. 1080 (1925). The traditional year and a day rule remains in effect in approximately twenty states. *State v. Minster, supra,* 486 A.2d at 1200 & nn. 4 & 5. A second suggestion calls for retention of the year and a day time limit, but a change in the concept from an irrebuttable presumption to a rebuttable presumption with a higher burden of proof. *See People v. Stevenson, supra,* 331 N.W.2d at 146–47 n. 4 (noting, but not adopting this alternative). The first two approaches are not mutually exclusive. A third alternative is complete abolition of the precept.

reason, sound policy, and a capacity for growth," and have refused to follow it where obsolete. *Gertman v. Burdick, supra*, 75 U.S.App.D.C. at 55, 123 F.2d at 931. This jurisdiction has expressly rejected the view that Congress intended in 1901 to freeze the common law or to prevent judicial modification. *Linkins v. Protestant Episcopal Cathedral Fund, supra*, 87 U.S.App.D.C. at 355, 187 F.2d at 360–61. Thus, the courts have not "hesitated to exercise the usual judicial function of revising and changing the common law." *Id.* at 355, 187 F.2d at 361 (citing *DeForest v. United States*, 11 App.D.C. 458, 466 (1897) (common law followed unless it becomes obsolete)). We have done so, moreover, even where the issue is not without controversy. *See, e.g., Arnold v. United States*, 358 A.2d 335, 348 (D.C.1976) (en banc) (abolishing requirement for corroboration in rape of mature female) (Mack, J., dissenting); *see also Gary v. United States*, 499 A.2d 815, 836, 859 (D.C.1985) (en banc) (Nebeker and Belson, JJ., dissenting on abolishment of corroboration requirement in sex offenses involving immature female; issue not ripe), *cert. denied,* —— U.S. ——, 106 S.Ct. 3279, 91 L.Ed.2d 568 (1986). In other instances the issue was fairly simple. *See, e.g., Tucker, supra*, 407 A.2d 1067 (involving the straight-forward question of the correct method of calculating age to determine whether one is a child for purposes of Family Division jurisdiction, D.C. Code §§ 11–1101, 16–2301 (1981)); *Warren v. United States*, 436 A.2d 821 (D.C.1981) (involving the propriety of expanding the definition of witness unavailability to include mental infirmities other than insanity). Viewing as we always have "our duty, as judges, to adapt the common law to reflect evolving norms and new circumstances, including new scientific and medi-

cal understanding, it is wise to look to other considered legislative and judicial judgments." *Warren, supra*, 436 A.2d at 828.

The justification for the rule has been under attack for some time. *See, e.g.,* W. LaFave & A. Scott, Jr., Criminal Law § 35 at 266 (1972) ("The difficulty in proving that the blow caused the death after so long an interval was obviously the basis of the rule. Now that doctors know infinitely more, it seems strange that the year-and-a-day-rule should survive to the present."). The government has ably pointed out in its brief the accelerated demise of the rule in the past twenty-five years. Of the eight[19] state courts which have been directly presented with the issue, *see supra* note 11, all have criticized the rule and only two, Maryland and Missouri, have declined to abolish the rule. The Maryland and Missouri courts chose to defer to the legislature on the reasoning that the legislature is better able to strike the balance between "adequate protection of society and justice for the individual accused,"[20] *State v. Brown, supra*, 318 A.2d at 261 (noting that the rule has overwhelming support in the United States), and because there was "no compelling reason to change the Missouri rule" which has existed since 1820 when Missouri became a state. *State v. Zerban, supra* note 11, 617 S.W.2d at 459. Another court has refused to apply the rule to involuntary manslaughter. *State v. Hefler*, 310 N.C. 135, 310 S.E.2d 310, 314 (1984); *accord, Commonwealth v. Evaul, supra*, 5 D & C 105 (cited in *Commonwealth v. Ladd, supra*, 166 A.2d at 502). Thus, as summarized by the Massachusetts Supreme Judicial Court, the continued existence of the rule in many jurisdictions, *see* Annot., *Homicide as*

---

**19.** *See, e.g., State v. Pine, supra*, 524 A.2d at 1107 (describing murder as a common law crime and year and a day rule as a judicial creation). A ninth court has criticized the rule as an anachronism. *State v. Edwards*, 104 Wash.2d 63, 701 P.2d 508, 511 (1985) (en banc). The *Edwards* court did not face the abrogation issue, however, because it ruled that a legislative extension of the period to three years could not be retroactively applied. In addition, an Illinois intermediate appellate court recently concluded

that the year and a day rule was not part of that state's statutory or common law. *People v. Mudd, supra* note 11.

**20.** The Maryland court recognized that "[i]t has been said that the rule often subsists only because of the infrequency of contested cases." *State v. Brown, supra*, 318 A.2d at 261 n. 8 (citing Comment, *"Year and a Day" Rule*, 37 N.D.L.Rev. 377, 378 (1961)).

*Affected by Lapse of Time between Injury and Death*, 60 A.L.R.3d 1323 (1974),

> is accounted for by the perdurability of statutes in some of them stating the rule, by the fact that over the past years there have been few occasions on which the issue has been raised and presented squarely to the courts for decision, and by a tendency to regard so old a dogma as peculiarly suitable for interment by Legislatures not courts.

*Commonwealth v. Lewis, supra,* 409 N.E.2d at 773 (footnote omitted).

In other jurisdictions, the rule has been abolished by statute. Of the thirteen jurisdictions which had enacted the rule by statute in 1941, only four retain the rule as of 1986. *State v. Minister, supra,* 486 A.2d at 1200 (citing Note, *Homicide: Why Death in a Year and a Day?,* 19 CHI-KENT L. REV. 181, 181 n. (1941)). New York and Oregon held the rule was abrogated when the legislature failed to include it in an expressly comprehensive criminal code revision. *Id.* & n. 4, *supra; People v. Brengard, supra,* 265 N.Y. at 105–08, 191 N.E.2d at 852–53; *State v. Hudson, supra,* 642 P.2d at 332. The Model Penal Code relies on general rules of causation. *See* MODEL PENAL CODE § 2.03, at 28–30 (*Proposed Official Draft 1962*); *Part II, § 210.-1, criminal homicide commentaries (1980).*

 Since the origin and rationale for the year and a day rule are hazy, and the generally acknowledged reason for the rule now appears highly suspect, we deem judicial abolition of the judicially-created rule appropriate. The rule has not been prominent in our jurisprudence. We have recently acknowledged advances in medical science in the proof of causation. *Greater Southeast Community Hospital v. Williams, supra,* 482 A.2d at 398. A limitation of a year and a day, therefore, could be unreasonably generous toward assailants who kill. In the absence of such a limitation, a defendant is assured the pro-

tections of due process as well as the continued obligation of the government to prove causation beyond a reasonable doubt. Moreover, the legislature could provide additional protections in the form of a temporal definition of death for homicide prosecution. But such legislative judgments as may be said to exist which are relevant to the year and a day rule, *see supra* note 15, do not weigh in favor of retention of it.[21] That we cannot predict with certainty the effects of abrogation of the rule in all situations is not a principled basis on which we can ignore the issue, which is squarely presented by a case that highlights the absurdity of continued application of the rule. Surely, the dictates of justice and public policy favor removal of a "capricious" obstacle to a prosecution for murder where the victim died fourteen months after having his brains blown out by a gunshot to the rear of his head which rendered him a paraplegic. Accordingly, finding no compelling public policy reason to retain it, we abrogate the year and a day rule, and leave it to a future court to determine, in the absence of any legislative action, whether the facts of some unknown future case might warrant judicial imposition of a cutoff period significantly longer than a year and a day.

C.

The final question is whether abrogation of the rule permits Jackson's prosecution for second-degree murder. Jackson contends his prosecution for second-degree murder would violate the double jeopardy clause of the fifth amendment because, as a result of his acquittal of assault with intent to kill, the government is collaterally estopped to show at a subsequent trial that Jackson acted with malice in shooting Bloss. He further contends his prosecution for second-degree murder would violate the ex post facto clause of the fifth amendment. We agree that Jackson's prosecution for second-degree murder would violate the ex post facto clause.[22]

---

21. In *Lewis v. United States,* 408 A.2d 303, 311 (D.C.1979), we declined to review the burdens

imposed on the government by the impeachment statute.

22. Although he does not challenge the right of

■ 1. The double jeopardy clause of the fifth amendment provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." The established test for determining whether two offenses are sufficiently distinct is set forth in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). Thus if each offense requires proof of a fact, or element of the crime, that the other does not, the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crime. *Brown v. Ohio*, 432 U.S. 161, 166, 97 S.Ct. 2221, 2225–26, 53 L.Ed.2d 187 (1977) (citing *Iannelli v. United States*, 420 U.S. 770, 785 n. 17, 95 S.Ct. 1284, 1293–94 n. 17, 43 L.Ed.2d 616 (1975)). However, since Bloss had not died at the time Jackson was prosecuted for assault with intent to kill, while armed, all the events necessary for prosecution of second-degree murder had not occurred when the prosecution for assault with intent to kill commenced. Double jeopardy, therefore, would not bar Jackson's subsequent prosecution for second-degree murder, *Garrett v. United States*, 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985); *Jeffers v. United States*, 432 U.S. 137, 150–52, 97 S.Ct. 2207, 2216–17, 53 L.Ed.2d 168 (1977); *Brown v. Ohio, supra*, 432 U.S. at 169 n. 7, 97 S.Ct. at 2227 n. 7; *Blackledge v. Perry*, 417 U.S. 21, 28–29 & n. 7, 94 S.Ct. 2098, 2102–03 & n. 7, 40 L.Ed.2d 628 (1974); *Ashe v. Swenson*, 397 U.S. 436, 453 n. 7, 90 S.Ct. 1189, 1199 n. 7, 25 L.Ed.2d 469 (1970) (Brennan, J., concurring); *Diaz v. United States*, 223 U.S. 442, 448–49, 32 S.Ct. 250, 251, 56 L.Ed. 500 (1912);[23] *Hopkins, supra*, 4 App.D.C. at 436–37, unless the government is collaterally estopped from proving that he acted with malice.

The Supreme Court has not decided whether collateral estoppel would apply when the defendant could not have been prosecuted for the greater offense at the time of the first trial and was acquitted.[24] It has forewarned, however, that the collateral estoppel rule "is not to be applied with the hypertechnical and archaic approach of a 19th Century pleading book, but with realism and rationality." *Ashe v. Swenson, supra*, 397 U.S. at 444, 90 S.Ct. at 1194. The question is "whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." *Id.* (quoting Mayers & Yarbrough, *Bis Vexari: New Trials & Successive Prosecutions*, 74 HARV.L.REV. 1, 38–39 (1960)).[25] In *Ashe*, the petitioner had been acquitted of robbing one of the victims at a card game after interposing a defense of alibi, and the government subsequently sought to prosecute him of robbing another victim. The Court held that the second prosecution was barred because the "single rationally conceivable issue in dispute before the jury was whether the petitioner had been one of

the government to appeal on double jeopardy grounds, Jackson's argument necessarily includes this question. Our double jeopardy analysis is required to resolve the question of our jurisdiction to entertain the government's appeal.

**23.** In *Diaz*, the Supreme Court rejected a plea of former jeopardy to a homicide prosecution because it was possible to put the accused, who had been convicted previously of assault and battery, in jeopardy for the homicide offense only when the victim, as a result of the assault and battery, died. 223 U.S. at 444, 449, 32 S.Ct. at 250, 251. "The death of the injured person was the principal element of the homicide, but was no part of the assault and battery." *Id.* at 449, 32 S.Ct. at 251. Therefore, the Court held that "all that could be claimed for that jeopardy was that it protected the accused from being again prosecuted for the assault and battery,

and therefore required that the latter be not treated as included, as a lesser offense, in the charge of homicide...." *Id.*

**24.** *People v. Harrison*, 395 Ill. 463, 70 N.E.2d 596 (1946), *cert. denied*, 334 U.S. 812, 68 S.Ct. 1013, 92 L.Ed. 1744 (1948) (defendant's acquittal of assault with a deadly weapon with intent to murder did not bar his subsequent prosecution for murder where victim died the day following the first trial); *accord, Hopkins, supra*, 4 App. D.C. at 436–37 (subsequent prosecution not barred merely because former prosecution is for the same act, but only if it was for "the *same offense;* 'the same identical act and crime,' the same in law as well as in fact," citing 2 Lead. Cr. Cas., notes by B & H 555) (dictum)).

**25.** The authors argue that the jury should be presumed to have acted rationally. *Id.* at 36–39.

the robbers. And the jury by its verdict found that he had not." *Id.* at 445, 90 S.Ct. at 1195. Since *Ashe*, this court has required that the record of the prior proceeding "affirmatively demonstrate[ ] that an issue involved in the second trial was definitely determined in the former trial, [and] the possibility that it may have been does not prevent the relitigation of that issue." *United States v. Smith*, 337 A.2d 499, 509, 510 (D.C.1975) (quoting *United States v. Haines*, 485 F.2d 564, 565 (7th Cir.1973), *cert. denied*, 417 U.S. 977, 94 S.Ct. 3184, 41 L.Ed.2d 1147 (1974)); *cf. Copening v. United States*, 353 A.2d 305 (D.C.1976).[26]

At Jackson's first trial, the jury was instructed that it could find him guilty of assault with intent to kill while armed only if it found beyond a reasonable doubt that he had the specific intent to cause Bloss' death.[27] If not, then Jackson would be guilty only of assault with a dangerous weapon upon "proof of general intent to do those acts that constitute an assault." Jackson claimed he shot in self-defense. No suggestion was made that assault with intent to kill could have been established simply from a wanton and reckless disregard of the reasonably foreseeable consequences of his shooting of Bloss. Moreover, the evidence showed that Jackson went looking for Bloss, supposedly because he believed Bloss had stolen his pistol, and after he located Bloss, he armed himself with his gun, approached Bloss and tried to force Bloss into his van. When Bloss resisted, Jackson struck him with the pistol. As Bloss ran away, Jackson fired one shot, hitting Bloss in the head. The jury found Jackson not guilty of assault with intent to kill while armed and guilty of assault with

a dangerous weapon and carrying a pistol without a license.

Malice "cannot be equated with specific intent to kill." *Logan v. United States*, 483 A.2d 664, 671 (D.C.1984). "The offense of assault with intent to kill ... encompasses assaults committed with the state of mind associated with certain types of voluntary manslaughter as well as assaults carried out with an intent to commit murder." *Id.* at 673 (citations omitted). Malice may be established by either of two standards: one is subjective—whether there was actual intent or foresight that death or serious bodily harm would result from the act—and the other is objective—whether a reasonable man would have foreseen that such result was likely. *Belton v. United States*, 127 U.S.App.D.C. 201, 204–05, 382 F.2d 150, 153–54 (1967). While the government's evidence could support a finding that Jackson acted with specific intent to kill, it also would support a finding that he acted with "a wanton disregard for human life" or with "a heart that is without regard for the life and safety of others." *Logan, supra,* 483 A.2d at 671 (citations omitted); *see Powell v. United States*, 485 A.2d 596, 601 (D.C.1984), *cert. denied*, 474 U.S. 981, 106 S.Ct. 420, 88 L.Ed.2d 339 (1985). Malice may be found even when there is no intent to kill. *See Carter v. United States*, 141 U.S.App.D.C. 259, 263 n. 18, 437 F.2d 692, 696 n. 18 (1970) (per curiam), *cert. denied*, 402 U.S. 912, 91 S.Ct. 1393, 28 L.Ed.2d 655 (1971); *United States v. Dixon*, 135 U.S.App.D.C. 401, 405–06, 419 F.2d 288, 292–93 (1969) (Leventhal, J., concurring). The jury at the first trial was not presented with the question of malice and there is no reason to believe that it necessarily determined that Jackson acted

---

**26.** As interpreted by this court in *Copening, supra,* the *Ashe* doctrine of collateral estoppel requires

> the concurrence in different proceedings of the three circumstances of (1) a common factual issue necessary to both factual issue necessary to both adjudications, (2) a prior determination of that issue in litigation between the same parties, and (3) a showing that the determination was in favor of the party seeking to raise the estoppel bar.

*Id.* at 309; *see Moore v. United States*, 120 U.S. App.D.C. 173, 175, 344 F.2d 558, 560 (1965)

(common factual issue and such issue was necessarily determined in the defendant's favor).

**27.** The trial court defined specific intent for the jury as involving "more than a simple general intent to engage in certain conduct or to do certain acts" since a defendant must "knowingly [do] an act which the law forbids intending with bad purpose to either disobey or disregard the law." The jury was instructed that such intent can be inferred from surrounding circumstances, including statements and acts done or omitted by defendant.

without malice.[28] Therefore, we hold the government is not collaterally estopped from attempting to prove malice in prosecuting Jackson for second-degree murder.[29] Accordingly, because the government's appeal is not barred by double jeopardy, the remedy of the dismissal of the indictment was not well founded.

2. The Constitution forbids, in Article I, Section 9, the passage of any ex post facto law by Congress. An ex post facto law, within the meaning of the U.S. Constitution, is one that:

> makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action. Second, every law that *aggravates a crime,* or makes it *greater* than it was, when committed. Third, every law that *changes the punishment,* and inflicts a *greater punishment,* than the law annexed to the crime, when committed. Fourth, every law that alters the *legal* rules of *evidence,* and receives less, or different, testimony, than the law required at the time of the commission of the offense, *in order to convict the offender.*

*Calder v. Bull,* 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798) (emphasis in original). Although the express language of the clause refers only to legislative acts, the Supreme Court has held that the fifth and fourteenth amendments prohibit retroactive application of any "judicial construction of a criminal statute [that] is 'unexpected and indefensible by reference to the law which has been expressed prior to the conduct in issue.'" *Bouie v. City of Columbia,* 378 U.S. 347, 354, 84 S.Ct. 1697, 1703, 12

L.Ed.2d 894 (1964) (citations omitted); *accord, Marks v. United States,* 430 U.S. 188, 191–92, 97 S.Ct. 990, 992–93, 51 L.Ed.2d 260 (1977).

As applied in *Calder,*[30] *Kring,*[31] *Hopt,*[32] and *Thompson,*[33] this court described the clear rule which emerged:

> Where a procedural change is made to an existing law which will adversely affect an accused by abrogating or impairing a defense which was available to the accused at the time of the offense; or by lessening or otherwise altering the quantity or degree of proof necessary to convict, the law comes within the prohibition of the ex post facto clause. However, where the legislative change "operate[s] only in a limited and unsubstantial manner to ..." the disadvantage of a defendant, and solely changes the manner in which the trial is conducted, it is not prohibited.

*Bowyer v. United States,* 422 A.2d 973, 980 (D.C.1980) (quoting *Beazell v. Ohio,* 269 U.S. 167, 46 S.Ct. 68, 70 L.Ed. 216 (1925))

We do not view Jackson's situation to fall within either the fair notice, *Bouie, supra,* 378 U.S. at 352, 84 S.Ct. at 1701–02, or standard of punishment, *Lindsey v. Washington,* 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182 (1937), aspects of the ex post facto clause. The statute defining the crime of murder in the second degree was not changed in any way on or after the day he shot Bloss, or on the day Bloss died; nor has the standard of punishment been enhanced since that time. Clearly, however, abrogation of the year and a day rule would deprive Jackson of a substantial right, or more accurately of a plea that

---

**28.** Jackson's reliance on *Illinois v. Vitale,* 447 U.S. 410, 420–21, 100 S.Ct. 2260, 2267, 65 L.Ed.2d 228 (1980), is unavailing. *Id.* at 419, 100 S.Ct. at 2266–67.

**29.** Jackson has also failed to offer any support for his challenged contention that the levied charges of mayhem and malicious disfigurement, D.C. Code § 22–506 (1981), were dismissed with prejudice. The docket entry for November 4, 1982 simply reads that "Count D" was dismissed by the government. In any event, this offense requires the specific intent to inflict a permanent disfigurement, *see Perkins v. United States,* 446 A.2d 19, 23–25 (D.C.1982),

which would also leave open the possibility of finding malice.

**30.** *Calder v. Bull, supra,* 3 U.S. (3 Dall.) 386, 1 L.Ed. 648.

**31.** *Kring v. Missouri,* 107 U.S. (17 Otto) 221, 2 S.Ct. 443, 27 L.Ed. 506 (1883).

**32.** *Hopt v. Utah,* 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884).

**33.** *Thompson v. Missouri,* 171 U.S. 380, 18 S.Ct. 922, 43 L.Ed. 204 (1898).

would bar prosecution,[34] which was available to him at the time he shot Bloss. As such, the year and a day rule is more than merely a rule of evidence. *Compare State v. Edwards, supra* note 16, 701 P.2d 508 (element of crime of murder) *with Commonwealth v. Ladd, supra,* 166 A.2d at 504 (rule of evidence). *See Commonwealth v. Lewis, supra,* 409 N.E.2d at 775 ("As to the ex post facto problem, characterization of the rule as 'evidential' or 'substantive' does not strike us as the key here."); *State v. Pine, supra,* 524 A.2d at 1108 (examining "importance of the right concerned and its effect on defendant"); *People v. Stevenson, supra,* 331 N.W.2d at 143 ("The key is the importance of the rights concerned and their effect on the defendant, not whether those rights can be characterized as merely evidentiary or procedural."); Comment, *The Abolition of the Year and a Day Rule, Commonwealth v. Ladd, 402 Pa. 164 (1960),* 65 Dick.L.Rev. 166, 167–169 (1961) (emphasizing substantive characteristics). The sufficiency of the evidence at issue in *Arnold, supra,* 358 A.2d at 341, where we applied retroactively our decision abolishing the evidentiary requirement of corroboration in rape cases,[35] is quite different from a right, or plea, which would prevent the prosecution itself regardless of the sufficiency of the evidence of causation. More is also involved than a mode of procedure, *compare Dobbert v. Florida,* 432 U.S. 282, 293–94, 97 S.Ct. 2290, 2298–99, 53 L.Ed.2d 344 (1977) (statute altered methods for determining whether death penalty was to be imposed); *Hopt v. Utah, supra* note 32, 110 U.S. at 590, 4 S.Ct. at 210 (statute repealed ineligibility of convicted felons to testify as a witness), or the admission of evidence of a particular kind, *see Thompson v. Missouri, supra* note 33, 171 U.S. at 388, 18 S.Ct. at 925 (statute allowing admission into evidence of writing exemplars of the defend-ant), or the legislative extension of a statute of limitations before the old limitations period had actually run on the defendant. *See United States v. Powers,* 307 U.S. 214, 59 S.Ct. 805, 83 L.Ed. 1245 (1939); *Clements v. United States,* 266 F.2d 397, 399 n. 4 (9th Cir.1959). Abrogation of the year and a day rule directly affects the offense with which Jackson could have been charged on the day Bloss died. *See Kring v. Missouri, supra* note 31, 107 U.S. (17 Otto) at 235, 2 S.Ct. at 454–55. However the year and a day rule is characterized, Jackson would lose the right to prevent the government from introducing evidence contrary to the presumption that Bloss' death was produced by natural causes, and thus alters the situation to Jackson's severe disadvantage. Accordingly, we agree with those courts which have held that application of a decision abrogating the year and a day rule would violate the ex post facto clause and be fundamentally unfair where a prosecution for murder was barred nearly five years ago. *See People v. Stevenson, supra,* 331 N.W.2d at 149 (applying ex post facto to avoid appearance of erratic or arbitrary action, improper in a lawgiver, five years after prosecution for murder barred by the year and a day rule).

Accordingly, the order dismissing the indictment is affirmed.

---

**34.** Jackson characterizes it as either a substantive defense or a conclusive evidentiary presumption that Bloss' death was the result of natural causes. At common law, the pleas of autrefois acquit and autrefois convict sought to bar a prosecution at a second trial. Mayers & Yarbrough, *supra,* 74 Harv.L.Rev. at 4.

**35.** In *Arnold,* the court noted "there was in fact adequate corroboration of the testimony of each victim." 358 A.2d at 341 n. 6. *Cf. Bowyer, supra,* 422 A.2d at 978–79 (retroactive application of abolition of the evidentiary corroboration requirement to a rape committed prior to *Arnold* constitutionally prohibited).