**Tran Van KHIEM, Appellant,**

v.

**UNITED STATES, et al., Appellees.**

**No. 91–CO–1028.**

District of Columbia Court of Appeals.

Argued Dec. 5, 1991.
Decided March 20, 1992.
Rehearing Granted, Opinion Amended
and Reissued, Rehearing En Banc Denied
Aug. 18, 1992.

Laurie B. Davis, Public Defender Service, with whom James Klein, Public Defender Service, and David L. Norman, Public Defender Service, Washington, D.C., were on the brief, for appellant.

Thomas C. Black, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., G. Paul Howes and Stephen P. Anthony, Asst. U.S. Attys., Washington, D.C., were on the brief, for U.S.

Janet L. Maher, Asst. Corp. Counsel, with whom John Payton, Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, and Ann O'Regan Keary, Deputy Corp. Counsel, Washington, D.C., were on the brief, for the District of Columbia.

Donald B. Verrilli, Jr. and David W. Ogden, Washington, D.C., filed a brief for the American Civil Liberties Union of the National Capital Area as amicus curiae, urging reversal.

Armin U. Kuder and John V. Long, Washington, D.C., filed a brief for the Washington Psychiatric Society as amicus curiae, urging affirmance.

Before SCHWELB and WAGNER, Associate Judges, and GALLAGHER, Senior Judge.

SCHWELB, Associate Judge:

Appellant Tran Van Khiem (Khiem) was charged in 1986 with the premeditated murder of his parents. He was found incompetent to stand trial and is presently detained at Saint Elizabeths Hospital (the hospital). He now appeals from an order of the trial court directing that he be treated, over his objection, with psychotropic drugs. The primary purpose of the proposed treatment would be to render Khiem competent to stand trial.

Khiem contends that the administration of these drugs to him without his consent would abrogate his common law right to bodily integrity, as well as his statutory rights under the Health Care Decisions Act

of 1988 (HCDA), D.C.Code § 21–2201 *et seq.* (1989). He also claims that the standards and procedures utilized by the hospital and by the trial judge in ordering treatment run afoul of the Due Process Clause of the Fifth Amendment. We hold that the trial court made a reasonable accommodation between Khiem's liberty interest and the government's interest in bringing him to trial, that the HCDA is inapplicable, and that the procedures utilized below satisfied applicable constitutional standards. Accordingly, we affirm.

I

## THE TRIAL COURT PROCEEDINGS

On the morning of July 24, 1986, the bodies of Mr. Tran Van Chuong and Mrs. Nam Tran Chuong, an elderly couple who were members of a prominent Vietnamese family,[1] were found in their home in northwest Washington, D.C. Investigation disclosed that both Chuongs had died from asphyxiation and that each had apparently been severely beaten. On July 25, 1986, their son, appellant Tran Van Khiem, then sixty years of age, was arrested and charged with the murders. A surety bond of $100,000 was imposed. Unable to post that amount, Khiem was detained at the District of Columbia Jail. An indictment was returned on April 22, 1987, charging Khiem with two counts of murder in the first degree. His trial was initially scheduled for July 1, 1987.

On June 25, 1987, following preliminary proceedings in which Khiem indicated that he did not propose to offer an insanity defense, Chief Judge Fred Ugast ordered that Khiem be transferred to the hospital for an examination of his mental condition. He directed the hospital to determine whether Khiem was competent to stand trial, whether an insanity defense might be available to him and, if so, whether Khiem

was competent to waive it. Following several examinations and communications with the court, the hospital reported that Khiem was competent to stand trial and that he did not qualify for an insanity defense. The trial was rescheduled for March 8, 1988 and began on that date.

As the trial proceeded, Khiem conducted himself in a bizarre manner.[2] At the request of defense counsel, Judge Ugast halted the proceedings and ordered a competency screening. On March 18, 1988, after hearing testimony from the examining psychiatrist, the judge found Khiem incompetent to stand trial. The judge declared a mistrial[3] and recommitted him to the hospital pursuant to D.C.Code § 24–301(a) (1989) for evaluation and treatment. The purpose of the commitment was to enable Khiem to regain his trial competency.

On June 13, 1988, the hospital reported that Khiem was incompetent to stand trial and that he was unlikely to regain his competency in the foreseeable future. This diagnosis was repeated on several occasions over the following two years at proceedings convened by the trial court.

A psychiatrist who had examined Khiem on behalf of the prosecution suggested at a 1989 hearing that anti-psychotic medication could have some potential for improving Khiem's condition and restoring his competency for trial. Judge Robert Shuker, to whom the case had been reassigned, directed the hospital to explore this possibility. The hospital advised the court, however, by letter dated September 18, 1989, that it had decided that psychotropic medication should not be administered to Khiem on an involuntary basis. It was the view of Dr. John Kelley, the Medical Director of the John Howard Pavilion, that Khiem was unlikely to respond positively to such medication and that his prognosis, with or without medication, was poor.

---

1. One of the Chuongs' daughters, Madame Ngo Dinh Nhu, is the sister-in-law of the last president of South Vietnam.

2. Khiem is reported to suffer from paranoid delusions about world-wide conspiracies related to him and his parents.

3. The conviction of an accused person while he is legally incompetent deprives him of his liberty without due process of law. *Pate v. Robinson,* 383 U.S. 375, 378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815 (1966).

On October 4, 1989, the prosecution filed a motion to require [Khiem's] involuntary medication. The defense responded with a motion to terminate Khiem's commitment. On September 25, 1990, Judge Robert M. Scott, to whom the case had been reassigned, directed the hospital to provide an updated report.

In response to the judge's order, the hospital reported that Khiem remained incompetent. Following an evaluation by his new doctor, Kenneth Rogers, M.D., however, the hospital now recommended that Khiem be treated with psychotropic drugs. The hospital indicated that psychotropic medication could reduce the symptoms of Khiem's illness (including his psychotic thinking) and render him competent for trial. Khiem invoked the hospital's internal administrative review procedures in an attempt to have this recommendation set aside. His administrative appeal was unsuccessful and, on March 19, 1991, Dr. Rogers' decision was affirmed by the hospital administration. Khiem, through counsel, asked the trial court not to follow the hospital's recommendation.

The trial judge convened two hearings to determine how Khiem's case should proceed. On April 11, 1991, after considering the briefs and arguments of counsel, he concluded that the question for his consideration was whether the hospital's recommendation was arbitrary or capricious. Thereafter, at an evidentiary hearing which began on July 29, 1991, the judge received the testimony of one medical witness called on behalf of Khiem and of three medical witnesses—Dr. Rogers, Dr. Kelley, and Dr. John Livingood[4]—called by the prosecution. The government's witnesses testified that the proposed involuntary treatment was medically indicated and that appropriate safeguards would be taken to avert any possible side-effects. The psychiatrist called by Khiem disagreed with the hospital's recommendation, but acknowledged that a minority of psychiatrists, especially those who practiced forensic medicine, might agree with the hospital's decision.

The judge ruled that the hospital's recommendation "has been shown to be wholly reasonable and to have been based upon clinical determinations which are well founded medically." He specifically found, contrary to Khiem's claims, that the hospital's treatment decision had not been influenced by a desire to accommodate the perceived wishes of the court or the prosecution. The judge rejected, on the strength of *Washington v. Harper*, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) and *United States v. Charters*, 863 F.2d 302 (4th Cir.1988) (en banc), *cert. denied*, 494 U.S. 1016, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990), Khiem's contention that the court was without authority to order treatment unless Khiem consented to it, either personally or through the substituted judgment process. The judge authorized the hospital to administer psychotropic medication to Khiem for a sixty-day period, but ordered that the patient be monitored for unfavorable side effects and that the treatment be discontinued if this was necessary to assure Khiem's well-being. The hospital was directed to make a progress report to the court within seventy-five days of the commencement of medication. This appeal followed.

II

SUBSTANTIVE LEGAL ISSUES—THE COMPETING INTERESTS

*A. In re A.C.*

■ Relying primarily on this court's reference in *In re A.C.*, 573 A.2d 1235, 1243 (D.C.1990) (en banc), to "the tenet common to *all*[5] medical treatment cases: that any person has the right to make an informed choice, if competent to do so, to accept or forego medical treatment," Khiem contends that the trial judge's order unlawfully overrode his common law right

---

4. Dr. Livingood had reviewed the treatment recommendation at the request of the hospital's chief clinical officer.

5. The emphasis to the word *all* was added in Khiem's brief.

to bodily integrity.[6] He claims that before authorizing psychotropic medication, the trial judge was required to make a determination whether Khiem was competent to decide whether such medication should be administered to him. Khiem further maintains that if the judge found him not to be competent to make that decision, then the judge was obliged to apply the principle of substituted judgment to ascertain what Khiem's wishes would have been if he had been competent to decide. *See A.C., supra,* 573 A.2d at 1249–51; *In re Boyd,* 403 A.2d 744, 750–52 (D.C.1979). Extracting *A.C.* from its context,[7] Khiem evidently maintains that in light of our decision in that case, trial judges are now without authority, as a matter of local common law, to order any medical treatment over a patient's objection, whether that objection is interposed directly by the patient or indirectly through the substituted judgment process. This rule, according to Khiem, is absolute; the court in *A.C.,* he insists, "recognized no limits on who is protected by this common law principle." Our decision in *A.C.,* as Khiem interprets it, would effectively enable a criminal defendant in his position to determine unilaterally whether he may be brought to trial. We discern nothing in *A.C.* which would support such a one-sided doctrine.

Khiem's bold approach derives any vitality which it may have from the court's use in the *A.C.* opinion of the words "all," 573 A.2d at 1243, and "every," *id.* at 1247. We recently reiterated in *United States v. Alston,* 580 A.2d 587, 594 n. 12 (D.C.1990), that this type of argument is predicated on a misconception of the nature and uses of judicial precedent, and therefore makes far too much out of too little:

> In *Kraft v. Kraft,* 155 A.2d 910 (D.C. 1959), the court pointed out that:
>
>> It is well to remember that significance is given to broad and general statements of the law only by comparing the facts from which they arise with those facts to which they supposedly apply.
>
> 155 A.2d at 913. *See also Armour & Co. v. Wantock,* 323 U.S. 126, 132–33, 65 S.Ct. 165, 168, 89 L.Ed. 118 (1944), where the Supreme Court aptly stated:
>
>> It is timely again to remind counsel that words of our opinions are to be read in the light of the facts of the order under discussion. *To keep opinions within reasonable bounds precludes writing into them every limitation or variation which might be suggested by the circumstances of cases not before the Court.* General expressions transposed to other facts are often misleading.

(Emphasis added.)

This court specifically noted in *A.C., supra,* 573 A.2d at 1245–46, that the right to

---

**6.** Khiem also cites the court's statement, later in the *A.C.* opinion, that "every person has the right, under the common law and the Constitution, to accept or refuse medical treatment," *id.* at 1247. He has, however, elected to cast his substantive argument (as distinguished from his procedural due process contentions discussed in Part IV, *infra*) exclusively in common law (rather than constitutional) terms. In its amicus brief urging reversal, the American Civil Liberties Union of the National Capital Area (ACLU) goes further and contends that the trial court's order that psychotropic drugs be administered to Khiem contravened the Due Process Clause of the Fifth Amendment.

We are not disposed to broaden the issues beyond those raised in Khiem's behalf by his able counsel from the Public Defender Service. *See Givens v. Goldstein,* 52 A.2d 725, 726 (D.C. 1947); *cf. United Parcel Serv. v. Mitchell,* 451 U.S. 56, 60 n. 2, 101 S.Ct. 1559, 1562–63 n. 2, 67 L.Ed.2d 732 (1981). This case does not present "exceptional circumstances" of the kind which would lead us to consider questions not raised by the parties. *See General Engineering Corp. v. Virgin Islands Water & Power Auth.,* 805 F.2d 88, 92 n. 5 (3rd Cir.1986).

**7.** In *A.C.,* the trial judge had authorized the hospital to deliver the patient's fetus by Caesarean section without first ascertaining through the substituted judgment mechanism what the patient's wishes would have been. This court reversed. The question in *A.C.,* namely, whether the uncertain prospects of saving the life of the fetus warranted compelling the patient to undergo major surgery without her consent, is obviously quite different from the issue here, which is whether the government's interest in bringing to trial a case involving two alleged murders is sufficient to outweigh Khiem's right to refuse the closely monitored administration to him, over a comparatively short period, of psychotropic drugs.

accept or reject medical treatment is not absolute. We commented that our discussion of the circumstances in which a patient's wishes may be overridden, even in the context of the case then before us, presupposed a "major bodily invasion," and we explicitly declined to draw the line between major and minor surgery. *Id.* at 1246 & n. 10. We found it unnecessary to decide, *see A.C., supra,* 573 A.2d at 1246 & n. 11, whether *Hughes v. United States,* 429 A.2d 1339 (D.C.1981) and *United States v. Crowder,* 177 U.S.App.D.C. 165, 543 F.2d 312 (1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 788, 50 L.Ed.2d 779 (1977), both upholding as reasonable minor surgical intrusions under the skin to remove bullets from criminal suspects, would be decided differently in light of *Winston v. Lee,* 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985), in which the Supreme Court rejected the government's request to recover a bullet from a defendant's chest by major surgery requiring a general anesthetic. Our discussion in the *A.C.* opinion of those cases necessarily recognized that law enforcement interests might be implicated in other cases, but we refrained from opinion on questions unrelated to the merits of the case before us. This court thus explicitly left open in *A.C.* the very kinds of issues which Khiem now claims to be foreclosed by that decision.

*A.C.* was not about, and could not decide, how much weight should be given in the judge's calculus to the government's interest in bringing to trial an accused who has been indicted for premeditated murder. The United States never had the opportunity in *A.C.* to present that law enforcement interest for the court's consideration. *A.C.* may not be converted, by barristerial ingenuity or judicial alchemy, into a sweeping rejection of contentions which were neither before the court nor relevant to the issues then at hand. We therefore cannot give *A.C.* the significance for the present controversy which Khiem attributes to it.

*B. Khiem's Interest in Bodily Integrity.*

As we indicated in *A.C.,* the common law liberty interest in one's own bodily integrity is an important one. The Supreme Court, speaking through Chief Justice Rehnquist, recently reiterated its view, initially articulated more than a century ago, that

> [n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.

*Cruzan v. Missouri Dep't of Health,* 497 U.S. 261, ——, 110 S.Ct. 2841, 2846, 111 L.Ed.2d 224 (1990) (quoting *Union Pac. R. Co. v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891)); *see also Schloendorff v. Society of New York Hospital,* 211 N.Y. 125, 129–30, 105 N.E. 92, 93 (1914) (Cardozo, J.). That right embraces a "significant liberty interest in avoiding the unwanted administration of antipsychotic drugs," *Harper, supra,* 494 U.S. at 221, 110 S.Ct. at 1036 for "[t]he forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Id.* at 229, 110 S.Ct. at 1041; *accord, Riggins v. Nevada,* —— U.S. ——, ——, 112 S.Ct. 1810, 1815, 118 L.Ed.2d 479 (1992).

We also agree with Khiem that his rights under the common law were not extinguished by his commitment to the lawful custody of the hospital. In *Harper, supra,* the Court recognized that a mentally ill individual who has been sentenced to imprisonment retains a right, both under state law and under the Due Process Clause of the Fourteenth Amendment, to be free from the arbitrary administration of antipsychotic medication. *Id.* at 221, 110 S.Ct. at 1036. *See also Boyd, supra,* 403 A.2d at 750–52 (ordering substituted judgment inquiry where civilly committed incompetent individual raised religious objection to administration of psychotropic drugs).

But our recognition of this important aspect of individual autonomy in a free society does not lead us to accord it the absolute and preemptive character which Khiem claims for it. The government cannot intrude upon Khiem's bodily integrity with-

out a showing of overriding justification and medical appropriateness. *Riggins, supra,* —— U.S. at ——, 112 S.Ct. at 1815. Once such a showing has been made, however, Khiem enjoys common law or due process protection only from an unreasonable or arbitrary determination that involuntary medication is appropriate. *See Harper, supra,* 494 U.S. at 221, 110 S.Ct. at 1036; *Charters, supra,* 863 F.2d at 305. Dean Prosser has remarked in a different but related context that "[a]s with 'medical paternalism,' the notion of patient sovereignty can be carried too far." W. PAGE KEETON, PROSSER AND KEETON ON THE LAW OF TORTS, § 32, at 190 n. 60 (5th ed. 1984). Khiem's common law interest, like his due process protections, must be weighed against any legitimate interests asserted by the state, *Harper, supra,* 494 U.S. at 223, 110 S.Ct. at 1037, and a reasoned accommodation must be made between the competing interests. *Id.* at 236, 110 S.Ct. at 1044.[8]

Moreover, Khiem having been lawfully committed to the hospital, the extent of his rights must be assessed in the context of his confinement. *Id.* at 222, 110 S.Ct. at 1037; *Charters, supra,* 863 F.2d at 305. The statute under which Khiem was committed, D.C.Code § 24–301(a) (1989), provides that the court may commit an apparently incompetent criminal defendant to a mental hospital for "care and treatment" in order to enable him to regain his competency. *See Williams v. Overholser,* 104 U.S.App.D.C. 18, 20, 259 F.2d 175, 177 (1958). It would surely be incongruous, in light of § 24–301(a), to hold that the court, after committing an accused for treatment to render him competent so that he can stand trial for the offenses with which he has been charged, is obliged to withhold treatment at the accused's sole option.

■ The Corporation Counsel contends in his brief that § 24–301(a) abrogates any common law right of [committed defendants] to refuse treatment." He claims that under that provision, courts may review treatment decisions by the hospital only to "make sure that it has made a permissible and reasonable decision in view of the relevant information and within a broad range of discretion." *See Tribby v. Cameron,* 126 U.S.App.D.C. 327, 328, 379 F.2d 104, 105 (1967). Khiem responds that a statute in derogation of the common law must be strictly construed, and that common law rights remain in effect unless expressly repealed or modified. *See United States v. Jackson,* 528 A.2d 1211, 1215 (D.C.1987); *O'Connor v. United States,* 399 A.2d 21, 26 (D.C.1979). In our view, however, the common law provides Khiem with essentially the same rights as those recognized by the court in *Tribby,* but no more. Section 24–301(a), as heretofore construed, is thus not in derogation of the common law.

■ Finally, Khiem contends that the prosecution is required to prove that its interest in medicating him over his objection is so compelling that no reasonable alternative exists. The availability of reasonable alternatives to the proposed treatment, if shown, would be a relevant factor in the overall inquiry, but this does not necessarily mean that the government must "set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional [or common law] complaint." *Harper, supra,* 494 U.S. at 225, 110 S.Ct. at 1038 (quoting *Turner v. Safley,* 482 U.S. 78, 90–91, 107 S.Ct. 2254, 2262, 96 L.Ed.2d 64 (1987)). In any event, as we show below, the law enforcement interest asserted by the government in the present case, which involves two alleged murders, is an especially compelling one. *Riggins, supra,* —— U.S. at ——, 112 S.Ct. at 1815.

---

8. In *Harper,* the Court explicitly rejected a constitutional contention by a mentally ill prisoner identical to Khiem's common law claim here:

Respondent contends that the State, under the mandate of the Due Process Clause, may not override his choice to refuse antipsychotic drugs unless he has been found to be incom-

petent, and then only if the factfinder makes a substituted judgment that he, if competent, would consent to drug treatment. *We disagree.*

494 U.S. at 222, 110 S.Ct. at 1037 (emphasis added).

## C. The Government's Interest in Bringing Khiem to Trial.

■ Having assessed Khiem's liberty interest, we turn now to the competing interest asserted by the United States. As Justice Brennan wrote in his concurring opinion in *Illinois v. Allen*, 397 U.S. 337, 347, 90 S.Ct. 1057, 1063, 25 L.Ed.2d 353 (1970),

> [t]he safeguards that the Constitution accords to criminal defendants presuppose that government has a sovereign prerogative to put on trial those accused in good faith of violating valid laws. Constitutional power to bring an accused to trial is fundamental to a scheme of 'ordered liberty' and prerequisite to social justice and peace.[9]

*Accord, Riggins, supra,* —— U.S. at ——, 112 S.Ct. at 1815, quoting *Allen* in the context of an involuntary medication issue raised in a murder case; *State v. Law*, 270 S.C. 664, 674, 244 S.E.2d 302, 307 (1978) (same). "[T]he community's interest in fairly and accurately determining guilt or innocence ... is of course of great importance." *Winston, supra*, 470 U.S. at 762, 105 S.Ct. at 1617–18. Since it has been impossible for several years to bring Khiem to trial to determine his guilt or innocence without first administering psychotropic medication, the government's interest is a "fundamental" one and of a very high order indeed.

In *Winston*, the Court treated as important (though not as controlling) the government's interest in obtaining a bullet from a criminal suspect's chest. That bullet would, however, have represented but one part of the evidence against the defendant. *Id.*, 470 U.S. at 765, 105 S.Ct. at 1619.[10] In the present case, it appears to be beyond dispute that if Khiem is not treated with psychotropic medication, the prosecution will not be able to bring him to trial at all. The societal interest at issue is therefore considerably greater than that presented by the government in the bullet recovery cases. As the Supreme Court noted in *Riggins, supra,* —— U.S. at ——, 112 S.Ct. at 1815, after quoting the *Allen* concurrence to emphasize that the government's opportunity to bring an accused to trial is fundamental to a scheme of ordered liberty, "the State might have been able to justify medically appropriate, involuntary treatment with the drug by establishing that it could not obtain an adjudication of Riggins' guilt or innocence by using less intrusive means."

The ACLU argues in its amicus brief that the government's interest is "largely symbolic," because even if Khiem is convicted, "he will in all likelihood return in short order to some form of institutional psychiatric care." We cannot agree with the ACLU's characterization. We note that Khiem has asked the court to terminate his commitment and that he emphatically denies that he is a danger to himself or to anyone else. An individual may not be civilly committed unless it is demonstrated that he is likely to injure himself or others. *See* D.C.Code § 21–521 (1989); *In re Melton*, 597 A.2d 892, 896–97 (D.C.1991) (en banc). Accordingly, if all of the declarations on Khiem's behalf were taken at face value, and if his legal contentions were to prevail, he might soon be a free man without his guilt or innocence of two murders having first been established, and this could continue indefinitely unless he regained his competency to stand trial. Unless we view the trial of homicide cases, the deterrence and punishment of crime, and the incapacitation of criminals as insignificant, the government's law enforcement interest in determining whether Khiem murdered his parents is far more than merely symbolic.

---

**9.** Justice Brennan added that if a resolution of criminal charges "cannot be reached by judicial trial in a court of law, it will be reached elsewhere and by other means, and there will be grave danger that liberty, equality, and the order essential to both will be lost." 397 U.S. at 348, 90 S.Ct. at 1063.

**10.** In *Hughes, supra*, 429 A.2d at 1339–40 and in *Crowder, supra*, 177 U.S.App.D.C. at 166; 543 F.2d at 313, on the other hand, operations were authorized for the purpose of recovering bullets lodged beneath the skin of each defendant, the court noting in each case that the required surgery would be minor, while the evidence sought to be recovered would be of substantial probative value.

*D. When Competing Interests Collide: Involuntary Administration of Medication to Restore a Defendant's Competency.*

■ Although the issue does not appear to have been squarely decided in this jurisdiction, most of the courts which have been asked to do so have upheld the involuntary administration of psychotropic drugs to restore or maintain a defendant's competency for trial.

In holding that the hospital may treat Khiem with such medication without his consent, the trial judge relied not only on *Harper* but also on *Charters*. In *Charters,* the United States Court of Appeals for the Fourth Circuit, sitting en banc, affirmed a trial court order authorizing the involuntary treatment with psychotropic medication of a mentally ill defendant who had been indicted for allegedly threatening the President of the United States. Charters had been found incompetent and committed to a prison mental health facility for psychiatric examination and treatment. The court held that although an individual so committed was not thereby stripped of all of his liberty interests, those interests which he retained were afforded protection only against arbitrary and capricious state action, and were adequately secured by the exercise of the professional judgment of the prison facility's medical personnel. 863 F.2d at 304–05. The court recognized that the government's interest in maintaining a pretrial detainee in a competent condition to stand trial was a "legitimate incident of institutionalization" to which Charters' interest must yield. *Id.* at 305–06.[11]

In *State v. Law, supra,* the Supreme Court of South Carolina rejected a contention very similar to that made by Khiem here:

Counsel for the appellant apparently takes the position that under no circumstances can medication be administered a defendant without his consent. They contend that such would be violative of his bodily integrity. We do not feel that such an absolute right exists. It is our view that medication may be administered without the consent of a defendant under compelling circumstances, *including those where the medication is necessary to render a defendant competent to stand trial.*

270 S.C. at 674, 244 S.E.2d at 307 (emphasis added).[12] *Accord, Ybarra v. State,* 103 Nev. 8, 13, 731 P.2d 353, 356 (1987) ("the majority of courts that have considered the issue have held that competency may be attained through the use of [involuntary] medication"); *State v. Lover,* 41 Wash. App. 685, 689, 707 P.2d 1351, 1353 (1985) (psychotropic medication may be administered without the consent of a defendant to render him or her competent to stand trial) (citing *Law, supra,* 270 S.C. at 674, 244 S.E.2d at 307); *State v. Hayes,* 118 N.H. 458, 389 A.2d 1379, 1382 (1978) ("the trial court may compel the defendant to be under medication at least four weeks prior to trial if the jury is [appropriately] instructed …"); *see also People v. Hardesty,* 139 Mich.App. 124, 362 N.W.2d 787, 793 (1985).[13]

---

**11.** Although we have focused in this opinion on the law enforcement interest in restoring Khiem's competence, there was also evidence before the trial judge which would support a finding that his order served other legitimate purposes. Dr. Kelley testified that Khiem's condition had deteriorated, that his delusions were expanding, and that he (Dr. Kelley) was concerned that, without psychotropic treatment, Khiem (who had already allegedly killed his parents) might strike out against others. *See Harper, supra,* 494 U.S. at 223–26, 110 S.Ct. at 1037–39. Dr. Livingood was of the opinion that medication was now appropriate "because the man does have a psychotic disorder and the treatment offers a chance to help the psychotic disorder and help him become more healthy." *See id.* at 225, 110 S.Ct. at 1038.

**12.** In *Law,* psychotropic medication had been administered to the defendant prior to trial, apparently without objection on his part, and he did not raise his challenge until after conviction. As reflected in the text, however, the court ultimately reached the issue here presented.

**13.** As the court stated in *Hardesty,*

[t]he state's substantial interest in bringing to trial defendants accused in good faith and on probable cause of violating its laws—an interest in the integrity of its criminal justice system and therefore at the very core of its police power—would seemingly be counted as sufficiently compelling to outweigh the defendant's interest in avoiding medication which,

Khiem relies on *Bee v. Greaves*, 744 F.2d 1387 (10th Cir.1984) for the proposition that his interest in bodily integrity trumps all competing state interests. As the court explained in *Bee*,

> the jail contends that it was entitled to inject Bee forcibly with thorazine in order to keep him competent for trial. As we noted initially, however, the state court found after a hearing "that Daniel H. Bee is not mentally ill and *is competent* to stand trial." Rec., vol. I, at 132 (emphasis added). Given this determination, *the state's asserted interest in keeping Bee competent to stand trial is not implicated in this case;* therefore it cannot serve to override Bee's interest in avoiding forcible medication with antipsychotic drugs.

*Id.* at 1395 (emphasis in original as to words *is competent*, added as to remainder). The issue raised here by Khiem was thus not before the court in *Bee*.[14]

Khiem also relies on *Boyd, supra,* in which this court applied the "substituted judgment" principle to an incompetent patient who had been civilly committed and who objected on religious grounds to the administration of psychotropic medication to her. There was no allegation, however, that Ms. Boyd had committed serious crimes and that it was necessary to bring her to trial. The governmental interest which we find controlling here was not presented in the *Boyd* case.

We are persuaded by the reasoning of *Charters, Law,* and other decisions authorizing psychotropic treatment without the accused's consent in cases such as this. Accordingly, we reject Khiem's common law claim.

> although highly intrusive, will generally not result in irreversible effects. (Footnotes omitted.) Winick, *Psychotropic Medication and Competence to Stand Trial,* 1977 American Bar Foundation Research Journal 769, 812–813.

362 N.W.2d at 793 (internal quotation marks omitted).

**14.** There is dictum in *Bee* questioning whether "[a] state interest unrelated to the well being of the individual or those around him," such as the interest in rendering him competent so that he

## III

### THE HEALTH CARE DECISIONS ACT

█ Khiem's contention that the trial court's order contravenes the HCDA need not detain us long. That statute has no bearing on the present case.

The HCDA begins with the following statement:

> The purpose of this chapter is to affirm the right of all competent adults to control decisions relating to their own health care and to have their rights and intentions in health care matters respected and implemented by others if they become incapable of making or communicating decisions for themselves.

D.C.Code § 21–2201(a) (1989). It creates a presumption of capacity, *id.* § 21–2203, and provides, *inter alia,* for certification of incapacity, *id.* § 21–2204; for durable powers of attorney for health care, *id.* § 21–2205; and for the mechanics of substituted consent, *id.* § 21–2210. The recitation of these provisions itself discloses that the HCDA was designed to address situations in which doctors, family members, and the courts may be required to make treatment decisions for a patient who has become unable to decide such matters for himself or herself.

That this was the Council's concern becomes apparent from an examination of the Act's legislative history. The "background and need" for the legislation were described as follows:

> The law regarding *decisions about life-sustaining treatment* and general health-care decision-making is not clear or uniform in its application. Many of the protracted proceedings held to deter-

might be brought to trial, could ever outweigh that individual's interest in bodily integrity. 744 F.2d at 1395. Whatever the merits of such speculation may have been at the time *Bee* was decided, that issue is now foreclosed by the Supreme Court's decision in *Harper,* 494 U.S. at 222–23, 110 S.Ct. at 1037, in which the Court explicitly rejected the contention that only the patient's interest could properly be considered. *Accord, Riggins, supra,* —— U.S. at ——, 112 S.Ct. at 1815.

mine the legal propriety of *decisions to forgo life-sustaining treatment* have been attended by considerable publicity, compounding already tragic situations for families involved. Further, it appears that often cases only get to court if there is tremendous disagreement, if the physicians are concerned about liability, or if the family's and physician's and/or hospital's moral analysis differ.

Report of the Committee on the Judiciary of the Council of the District of Columbia 2 (July 6, 1988) (emphasis added). Councilman Nathanson, who introduced the HCDA, explained that the legislation was intended to accommodate concerns regarding the authority of family members to make treatment decisions for incompetent relatives in light of the recent enactment of the guardianship law. *Id.* at 6.

The kind of problem which the HCDA was designed to address is similar to that presented in *A.C., supra.* The Act established a regime under which a competent patient's wishes are followed, while in the case of an incompetent patient, a "substituted judgment" is made; that judgment must be based on an informed estimate of what the patient would have desired if he or she had been competent. There is not the slightest indication in the statute or in its legislative history that the Council was addressing, or entertained any view regarding, the resolution of disputes between an incompetent pretrial detainee asserting an interest in his bodily integrity and a prosecutor who has countered with the government's law enforcement interest in bringing the accused to trial.

As in his discussion of our decision in *A.C.*, Khiem focuses on the use of the word "all" in § 21–2201. Quoting somewhat selectively from *Riggs Nat'l Bank v. District of Columbia*, 581 A.2d 1229, 1235 (D.C. 1990), he argues that "[i]n interpreting a statute, ... if the words are clear and unambiguous, [a court] must give effect to its plain meaning." [15] Two sentences later

in the *Riggs* opinion, we reiterated that "it is one of the surest indexes of a mature and developed jurisprudence *not to make a fortress out of the dictionary.*" *Id.* at 1235 [16] (quoting *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir.) (emphasis added), *aff'd* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945). Khiem's contention that the issue here presented can be resolved by resort to the Council's use of the word "all" exalts out-of-context literalism to undeserved preemptive pre-eminence. As Judge Learned Hand went on to note in *Cabell, supra*, 148 F.2d at 739, courts must "remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." *Accord, J. Parreco & Son v. District of Columbia Rental Hous. Comm'n*, 567 A.2d 43, 46 (D.C.1989) (quoting *Cabell*). Accordingly, we must identify the mischief which the legislation was designed to cure, rather than "mak[ing] a fetish out of plain meaning," or "wallow[ing] in literalism" to defeat the legislative intent. *Parreco, supra*, 567 A.2d at 46.

As Chief Justice Alvey stated for the court almost a century ago in *Ex parte Redmond*, 3 App.D.C. 317, 318 (1894),

[t]aking this language literally, and without reference to the occasion and purpose of the statute, it would certainly be comprehensive enough to embrace the proposed appeal here in question. But every statute must be construed with reference to the original intent and meaning of the makers, and which intent and meaning may be collected from the cause or necessity of the enactment, and the objects intended to be accomplished by it. With the known objects and purposes of the statute in view, general language may and should be restricted to the accomplishment of such objects and purposes, and not be made to embrace objects not contemplated by the authors

---

**15.** The ellipses in Khiem's quotation replace the words "we are mindful of the maxim." The omission of these six words tends to convert an allusion to a maxim which is an aid to statutory interpretation into a supposedly ironclad rule.

**16.** We further added that "it is useful to have [a dictionary] around." *Id.*

of the statute. This is an old and well settled canon of construction.

Times have changed, but the canon survives; this passage might well have been written with the present case in mind.

Finally, if we were to interpret the HCDA as Khiem proposes, that statute would be effecting a partial implicit repeal of § 24–301(a). Under the terms of the earlier statute, a committed patient in Khiem's circumstances is protected only from arbitrary and capricious treatment decisions of hospital officials, and does not have the kind of unfettered decision-making authority over his treatment contemplated by the HCDA. See Part II B, *supra*. Repeals by implication are not favored, and this canon must be taken seriously; mere lip service to it would leave legislators in a perpetual state of uncertainty about the possibility that every new enactment may have unintended consequences. *Speyer v. Barry*, 588 A.2d 1147, 1165–66 (D.C.1991); *see also United States v. Hansen*, 249 U.S.App.D.C. 22, 26, 772 F.2d 940, 944 (1985) (Scalia, J.), *cert. denied*, 475 U.S. 1045, 106 S.Ct. 1262, 89 L.Ed.2d 571 (1986).

## IV

## PROCEDURAL DUE PROCESS ISSUES

### A. Khiem's Contentions.

Finally, Khiem claims that the hospital and the trial court denied him procedural protections guaranteed by the Due Process Clause of the Fifth Amendment. He maintains that the government's law enforcement interest in attempting to restore his competency is insufficient to support the trial judge's order; we have rejected that contention in Part II of this opinion and do not revisit it here. Khiem also contends

(1) that the trial judge erred in deferring to the hospital's psychiatric judgment when the principal question before him was a legal one rather than a medical one;

(2) that the hospital's procedures were fatally defective because they did not provide Khiem with an adversarial hearing;

(3) that it was error for the court to order the administration of psychotropic drugs over Khiem's objection in the absence of expert testimony to a reasonable degree of medical certainty that the medication would probably render Khiem competent to stand trial; and

(4) that the hospital's decision to medicate was arbitrary and capricious, and should not have been approved by the court.

We address each of these contentions in turn.

### B. The Trial Court's Standard of Review.

Khiem's claim that the trial judge should not have deferred to the hospital's judgment under the circumstances of this case raises the most difficult of the procedural issues which have been presented for our review. Although substantial evidence was presented to support a finding that administration of psychotropic medication to Khiem was warranted even aside from the government's law enforcement interest, *see* n. 11, *supra*, the sequence of events in this record demonstrates that the treatment was precipitated by Khiem's incompetency and by the court's reasonable perception that all reasonable steps should be taken to render him competent to stand trial.

Psychiatrists are experts in determining the desirability of a proposed course of treatment as a means for achieving a given medical objective, and in identifying and appraising the medical risks that such a course of treatment may entail.[17] Their expertise does not, however, extend to determining how much weight should be given to the needs of law enforcement authorities who seek to bring an incompetent patient to trial and who ask the court to override his liberty interest in his bodily integrity. The reasons for the court to apply a deferential standard of review are at their zenith when only the patient's

---

17. "The risks associated with antipsychotic drugs are for the most part medical ones, best assessed by medical professionals." *Harper, supra*, 494 U.S. at 233, 110 S.Ct. at 1042.

medical interests are at issue. They are logically less compelling when non-medical factors must be included in the decision-making calculus.

Nevertheless, it has been held that a substantial measure of deference to psychiatric judgments is appropriate even where, as here, governmental interests of a non-medical nature are being weighed against the patient's interests. In *Harper, supra,* 494 U.S. at 231, 110 S.Ct. at 1042, the Supreme Court analyzed the issue as follows:

Notwithstanding the risks that are involved, we conclude that an inmate's interests are adequately protected, and perhaps better served, by allowing the decision to medicate to be made by medical professionals rather than a judge. The Due Process Clause has never been thought to require that the neutral and detached trier of fact be law trained or a judicial or administrative officer. (Citation and internal quotation marks omitted.) *Though it cannot be doubted that the decision to medicate has societal and legal implications, the Constitution does not prohibit the State from permitting medical personnel to make the decision under fair procedural mechanisms.*

(Emphasis added.) The Court added that it could not "ignore the fact that requiring judicial hearings will divert scarce prison resources, both money and the staff's time, from the care and treatment of mentally ill inmates." *Id.* at 232, 110 S.Ct. at 1042; *see*

*also Charters, supra,* 863 F.2d at 307–312.[18]

In the present case, as in *Harper* and *Charters,* an informed medical judgment on the benefits and risks of the proposed treatment is central to the weighing and accommodation of the competing interests, and the reasoning of the courts in *Harper* and *Charters* applies in full measure.[19]

Even if we were to conclude, contrary to the quoted passages from *Harper* and *Charters,* that the "societal and legal implications" of the issue before the trial judge warranted less deference to the hospital's recommendation than the judge accorded it, any error would not be prejudicial to Khiem. The trial court obviously recognized the importance of the government's law enforcement interest; indeed, it was Judge Shuker's allusion to that interest that set in motion the events which culminated in the entry by Judge Scott of the order now on appeal.[20] Moreover, if the decision as to the weight to be accorded to that interest is a legal one, as Khiem suggests, then it is ultimately one which this court must make.[21] Realistically, we have already made it, for we have held in this opinion that on this record the government's law enforcement interest outweighs Khiem's interest in bodily integrity, especially in light of the safeguards for which the trial court's order provides.

Khiem asks us to remand the case but, under these circumstances, a remand would serve no useful purpose. As we recently

18. As the court pointed out in *Charters,* the alternative to leaving base-line decisions to physicians subject to judicial review for reasonableness, has its own problems:

The proposed regime would install the federal courts as the base-line providers of procedural due process, collapsing their normal review function into this threshold function. With this would go all the cumbersomeness, expense, and delay incident to judicial proceedings every time an involuntary medication decision had to be made for any inmate. 863 F.2d at 309.

19. Indeed, Khiem implicitly acknowledges in his brief that his position cannot be reconciled with *Charters,* but suggests that *Charters* has been effectively overruled by the Supreme Court's later decision in *Harper.* We discern no

inconsistency between *Harper* and *Charters;* indeed, the two decisions point us in the same direction.

20. Judge Scott subsequently found, as we have noted, that the hospital's officials were not pressured by the court or by the prosecution to abandon their professional judgment. The judge heard the witnesses, and we are satisfied that there was ample support for his finding.

21. In *Harper, supra,* 494 U.S. at 234 n. 13, 110 S.Ct. at 1043 n. 13, the Court noted that in the overwhelming majority of cases, judges and other outside decisionmakers have concurred in the treating physician's decision to treat a patient involuntarily, and that the practical effect of requiring the decision to be made initially by a judge may thus be "chimerical."

had occasion to observe *en banc*, "[t]o remand the case simply for the purpose of requiring the judge to make the prescribed finding now would be a symbolic rather than a practical act, which we view as unnecessary and as incompatible with good judicial husbandry." *Melton, supra*, 597 A.2d at 908 (citations and internal quotation marks omitted).

## C. The Hospital's Procedures.

■ Khiem contends that the procedures utilized by the hospital in this case fail to meet applicable constitutional requirements. We do not agree.

The procedures for the involuntary administration of medication are governed by CMHS[22] Policy 50000.430 2A (April 18, 1990). This detailed nine-page single-spaced document provides in pertinent part that medication may be administered to a patient

in accordance with this Policy [only] if the patient has been afforded a consultation with the Patient Advocate, and an independent administrative review of the treating physician's decision to involuntarily administer medication has been performed. A patient also has the right to request a review by the Chief Clinical Officer, or the administration ... medical director if he/she is not satisfied with the recommendation resulting from administrative review.

The CMHS Policy provides the patient with notice of the proposed involuntary treatment, and assures that the patient is advised of his rights pursuant to it. The Patient Advocate is a mental health professional who is trained to advocate the patient's interest. The Advocate meets with the patient, informs him of the nature of the proposed treatment, and advises him of his procedural rights. It is also the Advocate's responsibility to convey the patient's concerns to the hospital's Medical Director.

The CMHS Policy provides two levels of independent administrative review of the treating physician's recommendation. The first level of review is conducted by the Medical Director of the Division where the patient is housed. The second review is by the Chief Clinical Officer. Neither of these reviewing officials is a member of the patient's treatment team.

The regime at the hospital is similar in most respects to that approved by the Supreme Court in *Harper, supra*, 494 U.S. at 228–35, 110 S.Ct. at 1040–44. It is true, as Khiem points out, that the procedure at issue in *Harper* included an adversarial hearing.[23] The Court gave no indication, however, that such a hearing was constitutionally required. Indeed, in *Parham v. J.R.*, 442 U.S. 584, 607, 99 S.Ct. 2493, 2507, 61 L.Ed.2d 101 (1979), the Supreme Court held in a somewhat comparable context that, although such a hearing may be required as a matter of state law, "due process is not violated by the use of informal, traditional medical investigative techniques."

In *Charters, supra*, the court, relying on *Parham*, explicitly held that no adversarial hearing is constitutionally required.[24] We reach the same conclusion in this case.[25]

---

**22.** CMHS is an abbreviation for the Commission on Mental Health Services.

**23.** Justice Stevens, who was joined in dissent by Justices Brennan and Marshall, characterized this hearing as a "mock trial before an institutionally biased tribunal." *Harper, supra*, 494 U.S. at 237, 110 S.Ct. at 1045.

**24.** The court said:
  Making an acceptable professional judgment of the sort here in issue does not require any internal adversarial hearing. *Parham*, 442 U.S. at 607 [99 S.Ct. at 2507] ... ("not necessary that the deciding physician conduct a formal or quasi-formal hearing"). The decision may be based upon accepted medical

practices in diagnosis, treatment and prognosis, with the aid of such technical tools and consultative techniques as are appropriate in the profession. *Id.* at 607–08 [99 S.Ct. at 2507].
*Charters, supra*, 863 F.2d at 312.

**25.** Khiem also contends that the hospital failed to follow its own Policy because it made no explicit finding as to his capacity to make a treatment decision. Under our analysis, the government's interest in bringing Khiem to trial would outweigh any objection on his part even if he had the capacity to object, so that psychotropic medication could properly be administered to him regardless of whether or not he was competent to decide whether he should

## D. The Sufficiency of the Connection Between the Treatment and the Treatment Goal.

■ Khiem contends that the hospital's decision was arbitrary because, according to him, no doctor has testified, to a reasonable degree of medical certainty, that the proposed treatment will probably render Mr. Khiem competent to stand trial. He apparently bases this contention on *Jackson v. Indiana*, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972). *Jackson* does not support his claim.

The question in *Jackson* was whether a criminal defendant may be committed indefinitely solely on account of his lack of capacity to stand trial. The Court held that a person so detained "cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future." *Id.* at 738, 92 S.Ct. at 1858. In the absence of a showing of such a substantial probability, the defendant must be released or civil commitment proceedings must be instituted. *Id.*

This eminently sensible holding provides no support for Khiem's claim that physicians may not inaugurate a course of treatment without advance assurance of probable success. Indeed, *Jackson* addressed neither the question of involuntary medication nor the scope of a court's review of medical judgments. In *Harper*, on the other hand, the Supreme Court held that the proper standard for reviewing governmental conduct in this kind of situation is to determine its reasonableness. 494 U.S. at 222–23, 110 S.Ct. at 1037. "[T]his basic regime—base-line decision committed to medical professionals, subject to judicial review for arbitrariness—has recently been upheld as comporting with due process...." *Charters, supra*, 863 F.2d at 308 (citations omitted).

## E. Arbitrariness and Irrationality.

■ Khiem also contends that the hospital's treatment decision must fail the test of rationality and lack of arbitrariness because the decision by the hospital's medical personnel was not made exclusively in the patient's medical interest. In *Harper*, however, the court made it clear beyond peradventure that the determination whether to medicate does not turn exclusively on the patient's interests, but also requires consideration of legitimate state interests. *Id.*, 494 U.S. at 223–26, 110 S.Ct. at 1037–39. The government's law enforcement interest in this case is a significant one, see Part II D, *supra*, and we hold that it was proper to consider it.

This is not a case in which a court authorized the hospital to perform complex brain surgery on an individual charged with disorderly conduct. Rather, the hospital has recommended psychotropic treatment of limited duration, which is to be closely monitored, to permit a determination through the judicial process as to whether Khiem committed two premeditated murders. The judge heard medical testimony which, if credited by him, established that the proposed treatment was consistent with sound medical practice. His decision to follow the hospital's recommendation was neither arbitrary nor irrational.

## V

## CONCLUSION

For the foregoing reasons, the order appealed from is hereby

*Affirmed.*

receive such treatment. The controlling government interest therefore renders the issue raised by Khiem irrelevant, and we do not reach it.

We note, however, that Khiem was found incompetent to stand trial. While there may in theory be a difference between being incompetent for that purpose and being incompetent to determine one's own interests in receiving or refusing medication, that difference "must certainly be one of such subtlety and complexity as to tax perception by the most skilled medical or

Before: ROGERS, Chief Judge, and FERREN, TERRY, STEADMAN, SCHWELB, FARRELL,* WAGNER, KING, and SULLIVAN,* Associate Judges.

ORDER

PER CURIAM.

On consideration of appellant's petition for rehearing en banc, the motion for leave to file supplement to petition, the lodged supplement, the motion of Legal Counsel for the Elderly to appear as amicus curiae, the lodged brief of amicus curiae, the response, opposition, and reply thereto, it is

ORDERED that the motions are granted and the Clerk is directed to file the lodged supplement to the petition and the lodged brief of amicus curiae; and it appearing that the majority of the judges of this court has voted to deny the petition for rehearing en banc, it is

FURTHER ORDERED that the petition for rehearing en banc is denied.

ROGERS, C.J., and FERREN, J., voted to grant rehearing en banc.

FERREN, Associate Judge, with whom ROGERS, Chief Judge, joins, stating reasons for rehearing this case en banc:

This case of first impression in this jurisdiction presents "a question of exceptional importance," D.C.App.R. 40(e): whether—and, if so, under what circumstances—the government can lawfully compel a person detained under a charge of first-degree murder, but found incompetent to stand trial, to receive psychotropic medication for the purpose of restoring competency.

I.

As of the time the division issued its first opinion in this case on March 20, 1992, the Supreme Court had said that even a prison inmate (and, presumably, an accused, such as Khiem, who had not yet been tried) "possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment."

Washington v. Harper, 494 U.S. 210, 221–222, 110 S.Ct. 1028, 1036, 108 L.Ed.2d 178 (1990). This court had held, moreover, that the "right to bodily integrity belongs equally to persons who are competent and persons who are not." In re A.C., 573 A.2d 1235, 1247 (D.C.1990) (en banc). Furthermore, we had stressed that, given the constitutional rights at stake, the government cannot lawfully override a person's objection to forced medication absent a "compelling state interest." In re Boyd, 403 A.2d 744, 753 (D.C.1979); see In re A.C., 573 A.2d at 1247 ("truly extraordinary or compelling reasons"); see also State v. Law, 270 S.C. 664, 674, 244 S.E.2d 302, 307 (1978) ("compelling state interest" required to justify forced medication); State v. Lover, 41 Wash.App. 685, 690, 707 P.2d 1351, 1353–1354 (1985) (same).

However, in this case—without even discussing the "compelling state interest" test—a division of this court, adopting the trial court's approach, held that the government may force-medicate an incompetent pretrial detainee in an effort to restore competency when the state's interest in doing so merely meets a test of "reasonableness," Harper, 494 U.S. at 223, 110 S.Ct. at 1037, unless the incompetent can demonstrate that the state's proposed action would be "arbitrary and capricious," United States v. Charters, 863 F.2d 302, 306 (4th Cir.1988) (en banc), cert. denied, 494 U.S. 1016, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990). The division, therefore, created its own, composite test from two cases, Harper and Charters, in derogation not only of the standard prescribed by our own caselaw (Boyd; A.C.) but also by cases from other jurisdictions on which the division itself relied (Law; Lover ).

On May 18, 1992, before the full court could act on the petition for rehearing en banc, the Supreme Court decided Riggins v. Nevada, —— U.S. ——, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992), which, as the division now recognizes, made its own earlier analysis in this case obsolete. As Justice Kennedy—the author of Harper—said,

psychiatric professionals." Charters, supra, 863 F.2d at 310.

* Associate Judges Farrell and Sullivan have recused themselves from this case.

concurring in the judgment in *Riggins*, a case of force-medicating a pretrial detainee "is not a case like *Washington v. Harper*," the earlier Supreme Court decision concerning an incarcerated felon's due process rights (in the context of the state's penological interest in the orderly administration of its prison) on which the division had principally relied. *Riggins*, —— U.S. at ——, 112 S.Ct. at 1818 (Kennedy, J., concurring).

As a consequence of *Riggins*, the division on rehearing has made two very significant changes from its first opinion. First, it has substantially raised the standard the government must meet before a pretrial detainee can be force-medicated. The division has abandoned *Harper*'s "reasonableness" standard in favor of traditional strict scrutiny: forced medication must survive a "compelling" state interest test. *See ante* at [166]. Second, the division has now clearly limited its holding to homicide cases. Whereas the District may have a compelling state interest in force-medicating Khiem, the District will not necessarily have such an interest in force-medicating pretrial detainees charged with lesser crimes.[1]

This is not to say the division opinion should stand, for it fails to deal sufficiently with the other criteria prescribed by *Riggins*—a concern to which I now turn.

## II.

In *Riggins*, a competent criminal defendant moved to suspend the administration of an antipsychotic drug, Mellaril, until after his trial, arguing (among other things)

that its continued use would prevent his showing jurors his true mental state when he offered an insanity defense. The Court held that forced administration of antipsychotic medication during trial violated rights guaranteed by the Sixth and Fourteenth Amendments because the record contained no finding that might support a conclusion that administration of antipsychotic medication was necessary to accomplish an essential state policy. The Court stressed that forced medication requires an "overriding justification and a determination of medical appropriateness," —— U.S. at ——, 112 S.Ct. at 1815, as the division now recognizes. *Ante* at [165].

The Court noted in *Riggins* that "the question whether a competent criminal defendant may refuse antipsychotic medication if cessation of medication would render him [or her] incompetent at trial is not before us." —— U.S. at ——, 112 S.Ct. at 1815. Thus, the Court put off a *Khiem*-type case to another day.[2] In giving reasons for stopping short of such a ruling, the Court stressed that it had "no occasion to finally prescribe such substantive standards as mentioned above, since the District Court allowed administration of Mellaril to continue without making *any* determination of the need for this course or *any* findings about reasonable alternatives.... Nor did the order indicate a finding that safety considerations or other *compelling concerns* outweighed Riggins' interest in freedom from unwanted antipsychotic drugs." *Id.* —— U.S. at ——, 112 S.Ct. at 1815–16 (third emphasis added). In short, the Court resolved the case on the absence

---

1. Nor does the District have an overriding state interest *per se* in force-medicating every incompetent pretrial detainee charged with murder; each case requires a careful balancing of the individual's and the state's competing interests. If the record in a particular case were to show, for example, that forced-medication would cause dangerous side effects or, in any event, would not be likely to restore competency, the government's interest in bringing an alleged murderer to trial would probably not override the accused's interest in remaining drug free.

2. It is important to note that the Court's entire discussion of the issues the Court did not reach in *Riggins*—including a *Khiem*-type situation—

assumes that antipsychotic drugs have already been administered to the detainee for medical reasons, and that such administration "was medically appropriate." *Riggins*, —— U.S. at ——, 112 S.Ct. at 1815. The Court, therefore, focused entirely on the question of terminating medication the defendant no longer wished to take. In contrast is Khiem's situation: antipsychotic drugs have never been administered for medical reasons, because Khiem's doctors had determined such treatment was not in the patient's best interest and because Khiem posed no threat to himself or others. Thus, Khiem has no experience with such drugs that could serve as a basis for evaluating possible side effects.

of findings, leaving it to the trial court on remand to address the "substantive standards." *Id.* —— U.S. at ——, 112 S.Ct. at 1815.

The six member majority of the Court, in an opinion by Justice O'Connor, did note that

Nevada certainly *would have* satisfied due process if the prosecution had demonstrated and the District Court had found that treatment with antipsychotic medication was [1] medically appropriate and, [2] considering less intrusive alternatives, [3] essential for the sake of Riggins' own safety or the safety of others. Similarly, the State *might have* been able to justify medically appropriate, involuntary treatment with the drug by establishing that it could not obtain an adjudication of Riggins' guilt or innocence by using less intrusive means. [Citations omitted.]

—— U.S. at ——, 112 S.Ct. at 1815 (emphasis added). That is all the guidance the Court gave. Significantly, however, as the foregoing statement makes clear, the Court indicated that involuntary medication would not necessarily be permitted for every pretrial detainee, even if less intrusive means were not available for achieving competency.

Justice Kennedy, writing separately, stressed the limitations on forced medication. Concurring in the judgment (leaving only Justices Scalia and Thomas in dissent), he pointed out that "this is not a case like *Washington v. Harper*, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), in which the purpose of the involuntary medication was to insure that the incarcerated person ceased to be a physical danger to himself or others." —— U.S. at ——, 112 S.Ct. at 1818 (Kennedy, J., concurring). Emphasizing the potentially dangerous side effects of antipsychotic medication, Justice Kennedy wrote to express his view that "*absent an extraordinary showing by the State*, the Due Process Clause prohibits prosecuting officials from administering involuntary doses of antipsychotic medicines for purposes of rendering the accused competent for trial in most cases, and to express doubt that the showing can be made,

given our present understanding of the properties of these drugs." *Id.* —— U.S. at ——, 112 S.Ct. at 1817 (emphasis added). He added that "the documented probability of side effects seems to me to render involuntary administration of the drugs by prosecuting officials unacceptable absent a showing by the State that side effects will not alter the defendant's reactions or diminish his capacity to assist counsel." *Id.* —— U.S. at ——, 112 S.Ct. at 1819. Furthermore, he said, "[i]n my view medication of the type here prescribed may be for the very purpose of imposing constraints on the defendant's own will, and for that reason its legitimacy is put in grave doubt." *Id.* —— U.S. at ——, 112 S.Ct. at 1820. Accordingly, it appears that Justice Kennedy believes forced-medication will rarely, if ever, be appropriate under the current state of medical knowledge, for he concluded that

If the State cannot render the defendant competent without involuntary medication, then it must resort to civil commitment, if appropriate, unless the defendant becomes competent through other means. If the defendant cannot be tried without his behavior and demeanor being affected in this substantial way by involuntary treatment, in my view the Constitution requires that society bear this cost in order to preserve the integrity of the trial process.

*Id.*

Justice Kennedy wrote his opinion, in part, because he believed the Court majority did not go far enough in instructing the District Court about what to do, substantively, on remand. *See id.* —— U.S. at ——, 112 S.Ct. at 1818. The fact that the six-member majority did not go further—absent "briefing or argument," *id.*—does not necessarily mean it would disagree with Justice Kennedy when addressing the substantive issue, especially in a case such as this where, in contrast with *Riggins*, the defendant has never taken psychotropic drugs and there is no clear finding of "medical appropriateness," —— U.S. at ——, 112 S.Ct. at 1815, without fear of dangerous side effects. *See supra* note 2.

It is important to emphasize that the Court majority in *Riggins* referred to the need for a "finding that safety considerations or other *compelling concerns* outweighed Riggins' interest in freedom from unwanted antipsychotic drugs," —— U.S. at ——, 112 S.Ct. at 1816 (emphasis added), and that Justice Kennedy referred to the need for an *"extraordinary showing"* before force-medication can be permitted, *id.* —— U.S. at ——, 112 S.Ct. at 1817 (emphasis added). This sounds very much like the "compelling state interest" test this court has adopted in *Boyd*[3] and in *A.C.*[4]—and the state courts, cited by the division in *Khiem*, have adopted when considering forced medication. *See Law*, 270 S.C. at 674, 244 S.E.2d at 307 ("compelling State interest" required to justify forced medication); *Lover*, 41 Wash.App. at 690, 707 P.2d at 1353–1354 (same).[5]

It is important to underscore, moreover, that in *Riggins*, as well as in both *Harper* and *Charters* (on which the division relies), the courts premised their analysis as much on the patient's own medical interest as on the state's interest. In contrast, in this case there is no trial court finding—and no ruling by this court—that the government's proposal to force-medicate Khiem was in his medical interest independent of the state's own interest in making him competent to stand trial.[6] Indeed, there is not even a finding that forced medication is likely to restore Khiem's competence. Nor are there any findings, as there were in *Harper* and in *Charters*, that Khiem is dangerous and that such medication is necessary to protect others.[7] There is also a serious question whether the findings as to side effects are sufficient under *Riggins*, and these findings surely would be insuffi-

---

3. *In re Boyd*, 403 A.2d 744, 753 (D.C.1979). In *Boyd* we held that, in a nonemergency situation, the state could not compel an involuntarily hospitalized, mentally ill and incompetent person who voiced religious objections to take psychotropic drugs against her will, which was to be ascertained, if necessary, by using substituted judgment analysis.

4. *In re A.C.*, 573 A.2d 1235, 1246 (D.C.1990) (en banc). In *A.C.*, we reviewed a court-authorized "caesarean section on a dying woman in an effort to save the life of her unborn child." *Id.* at 1237. We held that "in virtually all cases the question of what is to be done is to be decided by the patient—the pregnant woman—on behalf of herself and the fetus. If the patient is incompetent or otherwise unable to give an informed consent to a proposed course of medical treatment, then her decision must be ascertained through the procedure known as substituted judgment," *id.* at 1237, which means that "the court, as surrogate for the incompetent, is to determine as best it can what choice that individual, if competent, would make." 573 A.2d at 1249 (quotation omitted). It is not at all clear that a detainee the trial court has ruled incompetent to stand trial is also incompetent to give informed consent for invasive medical treatment.

5. The Court majority in *Riggins* specifically eschews adopting a standard of strict scrutiny, —— U.S. at ——, 112 S.Ct. at 1815, not because the majority disagrees with such a standard but because the majority has "no occasion to finally prescribe such substantive standards." —— U.S. at ——, 112 S.Ct. at 1815. The Court's reasoning and language, however—*e.g.*, its focus on the

Nevada court's failure to indicate whether "compelling [state] concerns outweighed Riggins' interest in freedom from unwanted antipsychotic drugs," —— U.S. at ——, 112 S.Ct. at 1816— virtually announces that the compelling state interest test applies. *See id.* —— U.S. at ——, 112 S.Ct. at 1826 (Thomas, J., dissenting). There is no principled way, after *Riggins*, that the trial court on remand can revert to *Harper's* "reasonableness" test.

6. The trial court found that the hospital's treatment decision to force-medicate Khiem was based on reasonable clinical considerations and was not "influenced by any bias, or institutional desire to comply with any perceived wishes of the Court or the government in this matter." But this goes no further than to say the physicians made a medical decision to force-medicate without compromising their professional judgment; it is not a finding that Khiem had a medical interest in receiving medication without regard to his trial.

7. The trial court and the division of this court may have assumed that a man charged with murdering his parents is dangerous to others— and that may be true—but that particular alleged homicide may or may not indicate more generalized dangerousness warranting medication. There is no finding on this issue. Footnote 11 of the division opinion—originally and on rehearing—merely refers to record evidence, not to trial court findings, concerning Khiem's potential danger. This court should not rely on appellate court fact-finding to buttress its opinion.

cient in Justice Kennedy's view.[8]

In fact, as indicated earlier, *see supra* note 2, in the instant case there is a major factual difference from *Riggins* and from other cases on which the division relies. Here, Khiem has never taken psychotropic medication; the side effects, if any, for him are unknown. *Compare Riggins,* —— U.S. at ——, 112 S.Ct. at 1814 ("administration of Mellaril" presumed "medically appropriate" because defense counsel never suggested treatment was "medically improper"); *Law,* 270 S.C. at 671, 244 S.E.2d at 306 ("psychotropic medications had positive effects"); *Lover,* 41 Wash.App. at 690, 707 P.2d at 1354 (medication "made it possible" for defendant to "appear[ ] at trial and confront[ ] witnesses"). This makes it all the more important for the trial court to address very specifically the question whether, absent any medical track record with Khiem, forced medication would be "medically appropriate." *Riggins,* —— U.S. at ——, 112 S.Ct. at 1814.

The division opinion on rehearing, therefore, despite honoring *Riggins* in important respects, fails to require the kind of trial court findings essential under *Riggins* to protect Khiem's liberty interest.

### III.

In sum, the division opinion, on rehearing, fails to come to grips as a matter of law—and as a matter of fact on this record—with the findings required, in light of *Riggins,* before a court may order forced-medication of a pretrial detainee. I am deeply troubled that this court is either too busy or too unconcerned to sit as a full court to hear this important issue about state-compelled injections of mind and body controlling drugs into an incompetent human being. *Riggins* makes clear that this case is on the frontier of judicial law-making affecting an exceptionally important liberty interest. Only three judges out of nine have formally ruled in this case. When only a third of the active judges, drawn by lot, sits on a case such as this, the decision is, by definition, a minority ruling if one recognizes that the en banc court has a responsibility to hear all exceptionally important cases. *See* D.C.App.R. 40(e). We should rehear this case en banc to determine whether the full court, after immersing itself in the briefs and record— and after oral argument focusing on *Riggins*—agrees with the division's result and reasoning.

---

8. There are findings here, as there were in *Harper* and in *Charters,* that Khiem will be adequately protected against possible dangerous side effects from the proposed medication. The trial court found that "the Hospital's procedures for treatment of patients who require medication constitute a careful scheme which assure that all possible effects of the proposed medications will be taken in to consideration before treatment is undertaken, and that possible risks of such treatment will be balanced against possible benefits of such treatment." The court ordered "that Mr. Khiem shall be carefully monitored by the Hospital staff for potential harmful side effects of the said treatment, and that

appropriate clinical steps shall be taken by Hospital staff in the event Mr. Khiem shall suffer any such side effects, including termination of the psychotropic medications treatment, if necessary for the well being of the defendant."

These findings fall short of assurances "that there is no significant risk that the medication will impair or alter in any material way the defendant's capacity or willingness to react to the testimony at trial," and "that the side effects will not alter the defendant's reactions or diminish his [or her] capacity to assist counsel." *Riggins,* —— U.S. at ——, 112 S.Ct. at 1818, 1819 (Kennedy, J., concurring).